Beatrice **LEVIN**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

**Nos. 67, 68, Dockets 31379, 31380.**

United States Court of Appeals Second Circuit.

Argued Sept. 26, 1967.

Decided Oct. 11, 1967.

**522**

Newton D. Brenner, New Haven, Conn. (Allen H. Duffy, Stephen L. Saltzman, New Haven, Conn., of counsel), for petitioner.

Louis M. Kauder, Atty., Dept. of Justice (Richard C. Pugh, Acting Asst. Atty. Gen., Meyer Rothwacks, Gilbert E. Andrews, Attys., Dept. of Justice, of counsel), for respondent.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The perils of acting without competent tax advice[1] are demonstrated anew, if further evidence be needed, by this petition to review a decision of the Tax Court, 47 T.C. 258 (1966), holding that distributions in 1960, 1961, 1962, and 1963 to the taxpayer in redemption of her stock in a family corporation were "essentially equivalent to a dividend" within the meaning of section 302(b)(1) of the Internal Revenue Code of 1954, and hence taxable at ordinary income rates.[2] We affirm the decision of the Tax Court.

The evidence, as found by the Tax Court,[3] established that Mrs. Levin's family corporation, the Connecticut Novelty Corporation, Inc., commenced operations as a partnership between her husband and her brother, Joseph Levine. In its early years the business centered on the wholesale distribution of "fireworks," but it shifted exclusively to retail jewelry after the state prohibited their use in 1951. Taxpayer succeeded to her husband's interest in the business upon his death in 1940. Thereafter, her brother Joseph came to live with her and her son Jerome, and became a "second father" to him. She relied heavily on Joseph's advice in business matters.

Following incorporation of the business in 1948, its 1300 outstanding single class common shares were held as follows: Joseph Levine, 650 shares; Mrs. Levin, 649 shares; Jerome Levin, 1 share.[4] The three stockholders also constituted the board of directors and officers of the corporation until Joseph Levine's death in April 1962, when Jerome's wife became a director. Taxpayer was secretary and treasurer until 1959, when she limited her office in the company to secretary.

Jerome was employed full time in the business since graduating from high school in 1944. In 1957 he contemplated marriage and discussed his status in the company with his mother and uncle in order to learn "where he stood" in the business. He insisted on this so that if it became necessary he could embark on

---

1. This is not meant to reflect upon taxpayer's counsel before us, who we understand were not involved in the original transaction.

2. The Tax Court found deficiencies in income taxes due of $1,015.22 in 1960, $1,037.74 in 1961, $970.04 in 1962, and $2,783.44 in 1963.

3. The facts were largely stipulated. The only significant factual dispute is whether a shift in control over the corporation actually occurred as a result of the redemption. In the view we take of the case, it is unnecessary to decide this question; nor need we consider whether, as taxpayer urges, the clearly erroneous

rule has any application to § 302(b)(1) cases. Compare Himmel v. Commissioner, 338 F.2d 815, 816 (2d Cir. 1964), Northup v. United States, 240 F.2d 304, 307 (2d Cir. 1957) with Towers v. Commissioner, 247 F.2d 233, 235–236 (2d Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958), Kirschenbaum v. Commissioner, 155 F.2d 23 (2d Cir.), cert. denied, 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628 (1946). See generally 1 Mertens, Law of Federal Income Taxation, § 9.100, p. 212, nn. 47.1 and 47.2 (Oliver ed. 1962).

4. Jerome paid no consideration for his one share.

another career while still young. Thereafter, Joseph and the taxpayer agreed to give him a greater participation in the business ownership and management. As a result the existing stock was cancelled and 1300 new shares of common stock were issued and distributed in this manner: Joseph, 485 shares; taxpayer 484 shares; Jerome, 331 shares. Jerome gave no consideration for the 330 additional shares.

Within a few years Jerome sought outright ownership of the business and to retire his uncle and mother. But he desired to accomplish this by a method which would make provision for them during the balance of their lives. Accordingly, on January 19, 1960, a plan was devised whereby the corporation would redeem the stock of taxpayer and Joseph at $200 per share. Pursuant to, this plan Joseph and taxpayer executed identical agreements with the corporation. She was to receive $7000 per year without interest beginning April 1, 1960 until $96,800 [5] was paid. Upon default the unpaid balance would become due upon the "seller's" election. As an alternative, the corporation was given the option to pay the entire or any part of the purchase price at any time. After the plan was consummated, Jerome conducted the business with "a greater freedom of action." But out of "respect and sentiment," as we are told, Joseph and taxpayer were retained as directors and officers of the corporation.

Coincidentally, the taxpayer and Joseph became eligible for social security benefits. But, they continued to perform services for the corporation and to receive salaries while at the same time taxpayer accepted a cut in her salary to $1200 per year, the maximum amount then permitted to be earned without a reduction in her social security benefits. See 42 U.S.C. § 403 (1964 ed.).

The dispute before us arises from taxpayer's treatment of the $7000 payments. In the taxable years in question, 1960 through 1963, she reported the compensation from the corporation under the 1960 agreement as long-term capital gains.[6] The Commissioner treated the payments as essentially equivalent to dividends and accordingly determined deficiencies for all the years in question.[7]

I.

The difference between a stock redemption that is essentially equivalent to a dividend and one that is not is grounded on a long history in the tax law. The distinction was essential because without it the tax on dividends at ordinary income rates could easily be defeated by the simple expedient of issuing more stock to the shareholders, who then would "sell" back their new shares to the corporation. It would then be asserted that the proceeds of this alleged sale were taxable at capital gains rates because they represented proceeds from the "sale" of a capital asset. To eliminate this patent loophole, Congress early provided that such distributions would receive capital gain treatment only if they were "not essentially equivalent to a dividend." See generally 1 Mertens, Law of Federal Income Taxation § 9.99 (Oliver ed. 1962).

But this simplistic formula created more problems than it solved for the courts were then called upon to answer the elusive question as to when a distribution was or was not "essentially equivalent to a dividend." At first it was generally believed that, in view of its history, the provision was aimed only at distributions motivated by a tax avoidance purpose. Accordingly, if a distribution served a "business purpose," the courts held it was not essentially equivalent to a dividend. This rationale was becoming increasingly difficult to apply, however, and it came to its demise in

---

5. This was computed by multiplying the number of shares taxpayer actually owned, 484, by the purchase price per share, $200.

6. She reported her cost as $100 per share, one-half the sales price.

7. The Commissioner also treated as essentially equivalent to dividends credits which the corporation allowed taxpayer against her obligation to pay for a cottage transferred to her in 1962. The Tax Court's valuation of this cottage at $19,000 is not challenged here.

1945 when, in interpreting an analogous statutory provision, the Supreme Court ruled that motive had little relevancy. The Court then adopted a more objective "net effect" test, under which the question of dividend equivalency depended on whether the distribution in redemption of stock had the same economic effect as a distribution of a dividend would have had. Commissioner v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611 (1945).[8] In time this test also proved ephemeral; some courts developed many criteria to determine the "net effect" of a distribution,[9] while in determining "net effect" we differed and relied primarily on changes in "basic rights of ownership."[10] However, most cases have been resolved on their own facts and circumstances.[11]

Until 1954 the "not essentially equivalent to a dividend" test, with all its perplexing problems, had been the sole statutory guide in this area. But the draftsmen of the 1954 Internal Revenue Code, faced with "the morass created by the decisions,"[12] attempted to clarify the standards and thus to make more precise the dividing line between stock redemptions that qualified for capital gains treatment and those that did not by adding objective tests, see § 302(b) (2)–(4), and rules defining constructive ownership, see § 318.

Since the "not essentially equivalent to a dividend" test is no longer applied in a vacuum, it is impossible to interpret it without examining the statutory scheme of which it is now a part. Section 302(a) provides that a stock redemption[13] shall be treated as an "exchange" if it falls into any one of the categories of § 302(b).[14] These categories are: (1) a redemption that is "not essentially equivalent to a dividend" under § 302(b) (1); (2) a "substantially disproportionate" redemption under § 302(b) (2); (3) a complete redemption terminating the shareholder's interest in the corporation under § 302(b) (3).[15] Section 302 (b) (2) contains an exact mathematical formula to determine whether the disproportion is "substantial." The test in § 302(b) (3) is not mathematical, but it is stated with equal clarity. The shareholder must redeem all of his actually and constructively owned stock to qualify for capital gain treatment under this provision, and § 302(c) (2) provides that if certain clear-cut conditions are met the family attribution rules of § 318(a) will not apply in determining whether the shareholder has disposed of all his stock.

Mrs. Levin concedes that she fails to meet the requirements of either § 302 (b) (2) or § 302(b) (3),[16] and so she

8. We recognized in Kirschenbaum v. Commissioner, 155 F.2d 23 (2d Cir.), cert. denied, 329 U.S. 726, 67 S.Ct. 75, 91 L. Ed. 628 (1946), that our earlier cases had been overruled as a result of *Bedford*.

9. Numerous criteria are listed in 1 Mertens § 9.100, at 214–15. See, e. g., Ferro v. Commissioner, 242 F.2d 838, 841 (3d Cir. 1957).

10. See, e. g., Himmel v. Commissioner, 338 F.2d 815, 817 (2d Cir. 1964).

11. See, e. g., Ferro v. Commissioner, 242 F.2d 838, 841 (3d Cir. 1957). See generally 1 Mertens §§ 9.99–9.100.

12. Ballenger v. United States, 301 F.2d 192, 196 (4th Cir. 1962).

13. Section 317(b) defines redemption for purposes of §§ 301–395 as a corporation's acquisition in its stock from a shareholder in exchange for property, whether or not the stock is cancelled, retired, or held as treasury stock. This definition settled the question whether there could be dividend equivalence if the redeemed stock was held as treasury stock rather than being cancelled. See Kirschenbaum v. Commissioner, 155 F.2d 23, 25 (2d Cir.), cert. denied, 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628 (1946).

14. A redemption that does not fall within one of these categories is treated, by virtue of § 302(d), as a distribution under § 301, i. e., as a dividend to the extent of current and post-1913 earnings and profits.

15. A fourth category deals with the redemption of the stock of certain railroad corporations under § 302(b) (4).

16. Taxpayer fails to meet the test of § 302(b) (3) because she remained a director, an officer, and an employee of the

relies on § 302(b) (1).[17] Our task of interpretation and reasoned elaboration cannot be adequately performed if we examine each provision as if it existed in a vacuum. The Code draftsmen hopefully expected that the preciseness of the tests set out in the new provisions, § 302(b) (2) and § 302(b) (3), would serve to relieve the pressure on the "not essentially equivalent to a dividend" test re-enacted as § 302(b) (1). The new requirements, if carefully observed, provided safe harbors for taxpayers seeking capital gain treatment. As a result, their enactment permitted more accurate and long range tax planning.

The legislative history of § 302 (b) (1) supports the view that it was designed to play a modest role in the statutory scheme. As originally passed by the House of Representatives, no provision was made for the "not essentially equivalent to a dividend" test; reliance was placed entirely on provisions similar to § 302(b) (2) and § 302(b) (3). Thereafter the Senate Finance Committee added § 302(b) (1) and explained its action as follows: [18]

> While the House bill set forth definite conditions under which stock may be redeemed at capital-gain rates, these rules appeared unnecessarily restrictive, particularly in the case of redemptions of preferred stock which might be called by the corporation without the shareholder having any control over when the redemption may take place. Accordingly, your committee follows existing law by reinserting the general language indicating that a redemption shall be treated as a distribution in part or full payment in exchange for stock if the redemption

is not essentially equivalent to a dividend.

As a leading commentator observed, "It is not easy to give § 302(b) (1) an expansive construction in view of this indication that its major function was the narrow one of immunizing redemptions of minority holdings of preferred stock." [19]

## II.

The 1954 Code also adopted a number of constructive ownership rules that provided for the attribution of stock owned by one person or legal entity to another. These provisions overruled the prior case law which unrealistically had not viewed the family as a unit unless other family members were "dummy stockholders." Lukens v. Commissioner, 246 F.2d 403, 407–408 (3d Cir. 1957). By providing a "reasonable rule of thumb," [20] these rules reduced the difficulties necessarily involved in determining in each case the extent of actual control in a family corporation, in which informal influence over relatives, often impossible of proof, was more important than formal control through voting rights based on actual stock ownership. Like § 302(b) (2) and § 302(b) (3), these rules represented an attempt to make the law more predictable, and thereby to serve as aids to the tax or estate planner.

Section 318(a), the family attribution rule applicable here, provides in relevant part:

> General rule.—For purposes of those provisions of this subchapter [§§ 301–395] to which the rules contained in this section are expressly made applicable—
>
> *(1) Members of family.—*
>
> *(A) In general.*—An individual shall be considered as owning the

---

corporation after the redemption. Moreover, she failed to file the proper notification with the Secretary of the Treasury.

17. In determining whether the redemption satisfies § 302(b) (1), we are directed by § 302(b) (5) not to take into account that the redemption fails to meet the requirements of § 302(b) (2) or § 302(b) (3); but a discussion and un-

derstanding of these provisions are useful in interpreting § 302(b) (1).

18. S.Rep.No. 1622, 83rd Cong., 2d Sess., 44–5 (1954), U.S.Code Cong. and Admin. News 1954, p. 4675.

19. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders (2d ed.) 291.

20. Bittker & Eustice, op. cit., 288.

stock owned, directly or indirectly, by or for—

\* \* \* \* \* \*

(ii) his children \* \* \*

In this case, then, the taxpayer must be deemed the owner of her son's shares since § 302(c) (1) provides in part: "section 318(a) shall apply in determining the ownership of stock for purposes of this section." [21]

## III.

Taxpayer argues that the family attribution rules should not be determinative in this § 302(b) (1) case. But the definitive language of the statute gives her small comfort despite the three cases upon which she relies so heavily.

In Perry S. Lewis, 47 T.C. 129 (1966), the Tax Court ignored the stock attribution rules in deciding a § 302(b) (1) case. Lewis and his sons owned an automobile dealer franchise, and Lewis' shares were redeemed after the automobile manufacturer put heavy pressure on older men like Lewis to yield franchises to younger men. Lewis severed all relations with the corporation other than remaining as an apparently honorary director and officer. The Tax Court held that distributions to Lewis over a period of five years in exchange for his stock were not essentially equivalent to a dividend, because the stock redemption served a substantial "business purpose." While the majority ignored altogether the family attribution rules, Judge Simpson, in a separate concurrence, pointed out that they required that Lewis be treated as owning his sons' shares, and hence as owning 100% of the corpora-

tion's outstanding stock. He concurred, however, on the ground that there was a complete termination of Lewis' interest in the corporation which satisfied § 302(b) (3). *Lewis* does not aid the taxpayer [22] because this court has not looked with favor upon the "business purpose" test.[23] Even if we were to consider it, the Tax Court failed to articulate any reason for ignoring § 318. But, taxpayer argues that the Tax Court in *Lewis* simply considered the "bona fides" of the change in ownership with special care because of the attribution rules, and suggests we do the same. We have already stated that the core of the changes made by the 1954 Code in this not uncommon reticulate fashion for a tax statute was to shift from uncertainty and impreciseness to objective tests; "tax administration would be severely handicapped if the rules applied only as presumptions \* \* \*" Ringel, Surrey & Warren, Attribution of Stock Ownership in the Internal Revenue Code, 72 Harv.L.Rev. 209 (1958). Acceptance of taxpayer's argument would eviscerate the attribution rules and all that Congress hoped to achieve thereby.

Mrs. Levin also refers us to the footnote dictum in Ballenger v. United States, 301 F.2d 192, 199 (4th Cir. 1962), indicating that some commentators have "suggested that the attribution of ownership rules should not be too literally applied to § 302(b) (1)." It is interesting, however, that the attribution rules were applied in *Ballenger,* and the quoted dictum lends feeble support to taxpayer's claim that the attribution rules should be ignored here as they were in *Lewis.*

---

21. Although some commentators have argued that the attribution rules are not applicable to § 302(b) (1) because it does not expressly refer to the "ownership" of stock, Bittker & Eustice, op. cit., 292, correctly point out that it is reasonable to apply the attribution rules whenever ownership of stock is relevant, whether by statutory direction or otherwise. Indeed, the Treasury Regulations initially made the application of the attribution rules to § 302(b) (1) mandatory, 19 Fed. Reg. 8240 (1954), although they now provide only that the attribution rules

"must be considered," Treas.Regs. § 1.-302-2(b), thus allowing some play in the joints for cases hereinafter discussed, e. g., situations involving family estrangement.

22. Of course the concurring opinion in *Lewis* does not support taxpayer's position here, because she makes no claim that there was a complete redemption under § 302(b) (3).

23. See McGinty v. Commissioner, 325 F. 2d 820 (2d Cir. 1963).

Finally, taxpayer relies on another footnote observation in Himmel v. Commissioner, 338 F.2d 815, 820 (2d Cir. 1964), stating that "[w]e think it quite proper to be aware of the effect of a distribution on significant corporate interests without strict regard to the attribution rules." The reliance is misplaced. In *Himmel* we *applied* the attribution rules in determining that if there had been a dividend on the common stock rather than a redemption of the non-voting cumulative preferred, taxpayer *constructively* would have received significantly *less* than he did as a result of the redemption. This alteration in rights to earnings was "substantial enough in itself to bar treatment of the redemption as 'essentially equivalent to a dividend.' In no other case has a comparable difference apparently been considered otherwise." *Himmel*, at 818. In the case before us, if there had been $14,000 annual dividends (the amount of the annual distributions to taxpayer and Joseph) instead of a stock redemption, taxpayer would have received constructively about $8,778 [24] or *more* than she received from the stock redemption. The Tax Court correctly stated that the comparative dividend test is designed to test "whether the distributions *equal or exceed* the amounts that would be received as a cash dividend," and that accordingly *Himmel* "is not analogous."

Moreover, *Himmel* involved a corporation with three classes of stock which were not held proportionately. This situation created "additional and more difficult problems;" [25] compliance with § 302(b) (2) was impossible,[26] and immediate compliance with § 302(b) (3) was impractical.[27] By contrast, in the present case taxpayer easily could have complied with § 302(b) (3) by simply

resigning as a director, officer, and employee of the corporation and notifying the Secretary of the Treasury.[28] She simply could not have her cake and eat it too.

We do not hold that there may not be cases in which strict application of the attribution rules may be inappropriate. In addition to the preferred stock situations referred to in the Senate Report quoted supra, family estrangement may render the application of the family attribution rules unwise. See Bittker, The Taxation of Stock Redemptions and Partial Liquidations, 44 Cornell L.Q. 299, 324 (1959); Moore, Dividend Equivalency—Taxation of Distributions in Redemption of Stock, 19 Tax L.Rev. 249, 252–55 (1964). But in the case before us taxpayer has offered no valid reason for ignoring the family attribution rules, and we perceive none.

## IV.

Accordingly, we must attribute Jerome's shares to his mother. As a result, before the redemption she constructively owned her 484 shares and her son's 331 shares, or about 63 per cent of the 1300 outstanding shares. After the redemption she still constructively owned her son's shares. Thus, after the redemption of the stock owned by her and her brother, by the rule of attribution she became the constructive owner of 100 per cent of the outstanding stock. It is apparent therefore that her constructive ownership actually increased as a result of the redemptions. As the Tax Court said, this "is most unlike a sale." For when a taxpayer's (constructive) ownership decreases by a significant amount, we are justified in concluding that a substantial reduction in taxpayer's interest in the corporation has occurred

24. Taxpayer actually owned 37.2 per cent of the stock, and constructively owned another 25.5 per cent (Jerome's), or 62.7 per cent in all; 62.7 per cent of $14,000 is $8,778.

25. *Himmel*, supra 338 F.2d at 818.

26. The test of § 302(b) (2) depends on a reduction in the amount of voting stock

held; in *Himmel*, non-voting stock was redeemed.

27. The corporation lacked the funds to redeem all the taxpayer's stock.

28. See § 302(c) (2) (A). In addition, taxpayer would have had to satisfy the requirement of the last sentence of § 302(c) (2) (B).

warranting capital gain treatment as a sale or exchange. But when only a small reduction in control occurs, the distribution has been held to the essentially equivalent to a dividend; *a fortiori*, when no reduction, but rather an increase, in control occurs, taxpayer has not parted with anything justifying capital gain treatment.

The Tax Court correctly noted that in this case control in the sense of access to corporate benefits was more important than any legal right to direct the destiny of the corporation. In reality, taxpayer's benefits from the corporation changed little as a result of the redemption. Before 1960 she received a salary of $7800 per year; after 1960 she received $8200 per year, composed of annual distributions of $7000 and salary of $1200. While in form taxpayer redeemed her stock, in substance she parted with nothing justifying capital gain treatment.[29]

The judgment is affirmed.

29. We reject as without merit taxpayer's argument that our holding imposes a tax on her gross receipts in violation of Art. I, § 9, Cl. 4 of the Constitution, which forbids "direct" taxes except in proportion to the census. Her basis does not disappear; it simply is transferred to her son. See Treas.Regs. § 1.302–2(c).