**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**ESTATE of Joseph L. ANTRIM, Jr., Deceased, State-Planters Bank of Commerce and Trusts and Betty Taylor Antrim, Executors, and Betty Taylor Antrim, Respondents.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Richard H. CARDWELL, Jr. and Annie Belle T. Cardwell, Respondents.**

**Nos. 11943, 11944.**

United States Court of Appeals
Fourth Circuit.

Argued March 8, 1968.

Decided April 26, 1968.

Melva M. Graney, Attorney, Department of Justice, (Mitchell Rogovin, Asst. Atty. Gen., and Meyer Rothwacks, Attorney, Department of Justice, on brief), for petitioner.

H. Brice Graves, Richmond, Va. (Lee F. Davis, Jr., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for respondents.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and MER-HIGE, District Judge.

WINTER, Circuit Judge:

In Estate of Joseph L. Antrim, Jr., Deceased, et al., T.C. (1967), a redemption of preferred stock was held entitled to capital gains treatment under § 302 (b) (1) of the Internal Revenue Code of 1954. 26 U.S.C.A. § 302(b) (1). The Tax Court's decision that the distribution was "not essentially equivalent to a dividend," within the meaning of the Code, proceeded primarily from its finding that "the redemption was substantially disproportionate with regard to the common stockholders and it thus lacked an important dividend characteristic, that of prorata distribution of earnings and profits among holders of the common stock." Id. The government challenges the correctness of this conclusion in this appeal.

In Ballenger v. United States, 301 F.2d 192 (4 Cir. 1962), we had occasion to consider a similar question, and we approved resort to the test of dividend equivalence employed by the Tax Court in this case. In *Ballenger* we noted the existence of two lines of decisions—the "net effect" test, under which a court hypothesizes the declaration of dividend, instead of the redemption of stock, in "the same amount" (Id., p. 196) as the redemption and determines, from the standpoint of each stockholder-taxpayer, if the results from the hypothetical dividend and the actual redemption are essentially the same; and what may be called the "net effect, plus" test, under which the strict "net effect" test is employed together with a further consideration, namely, whether there are legitimate business purposes for the redemption. Under the "net effect" test, dissimilarity, or substantial disproportion, usually results in a taxpayer-stockholder's being afforded capital gains treatment;[1] under the "net effect, plus" test similarity, or substantial proration, does not operate to deny capital gains treatment if a legitimate business purpose for the redemption is proved. It was unnecessary for us in *Ballenger* to choose betwen the lines of authority, and we declined to do so. Likewise, we find it unnecessary to make a choice in the instant case.

The government does not question the propriety of resort to the strict "net effect" test in these cases. Its claim is that the test was misapplied. Analysis of its claim requires a consideration of the facts:

Stripped of unessentials, the facts are that C. W. Antrim & Sons, Inc. (the "corporation") concluded to redeem its 800 shares of 6% cumulative, non-voting preferred stock. As of October 1, 1959, the date of redemption, the preferred stock was redeemable, *in toto*, at $100 per share plus accumulated dividends. At the time of the redemption, the preferred

---

[1] Under this test, a taxpayer-stockholder may still be entitled to capital gains treatment even though the redemption is prorata with the hypothetical dividend if, as a result of the redemption, he incurs a detriment vis-a-vis other stockholders in such matters as liquidation rights. Himmel v. Commissioner of Internal Revenue, 338 F.2d 815 (2 Cir. 1965).

stock, and all of the corporation's issued common stock, was owned by the following persons, who received the following amounts, exclusive of dividends:

| | Common Stock | | Preferred Stock | | Distribution in Redemption |
|---|---|---|---|---|---|
| | Shares | % | Shares | % | |
| Joseph L. Antrim, Jr. | 5,333 | 66⅔ | 120 | 15 | $12,000 |
| Richard H. Cardwell, Jr. | 2,667 | 33⅓ | 20 | 2½ | 2,000 |
| Annie Bell T. Cardwell | | | 20 | 2½ | 2,000 |
| Nora Lee Antrim | | | 640 | 80 | 64,000 |
| Total Shares | 8,000 | | 800 | | |

The tax consequences of the distribution to Joseph L. Antrim, Jr. and to Richard H. Cardwell, Jr. for the year 1959 are in issue. Since Joseph L. Antrim, Jr. has died, the litigation is carried on by his estate. Since Richard H. Cardwell, Jr. and Annie Belle T. Cardwell are husband and wife, and since they filed a joint return for 1959, both are parties to the litigation. Additionally, § 318(a) (1) (A) (i) of the Code, 26 U.S.C.A. § 318(a) (1) (A) (i), require that, *inter alia*, for the purpose of determining capital gains treatment of a stock redemption, Richard H. Cardwell, Jr. shall be considered as owning the stock owned by his wife, Annie Belle T. Cardwell. The distribution to Nora Lee Antrim is not in issue because that distribution fits into the § 302(b) (3) "safe harbor" provision, of the Code. 26 U.S.C.A. § 302(b) (3).[2]

To determine whether the redemption was essentially equivalent to a dividend, the Tax Court hypothesized a dividend in the aggregate amount of $80,000 on the corporation's common stock and determined that the taxpayers would receive the amounts (in round figures) which bore the relationship to the amounts which they received as a result of the redemption, as shown in the following table:

| | Distribution in Redemption | Distribution of Hypothetical Dividend |
|---|---|---|
| Joseph L. Antrim, Jr. | $12,000 | $53,333 |
| Richard H. Cardwell, Jr. | 4,000[3] | 26,666 |

To avoid the manifest disparity between the amounts that the taxpayers received in redemption and what they would have received if the same amount were distributed as a dividend on common stock, the Commissioner argues that the only proper comparison is between the distribution of $80,000 in redemption of preferred stock and $16,000 in payment of a dividend on common stock. Short of the comparison he urges, the Commissioner concedes that the distributions to the taxpayers were not comparable, and that he cannot prevail; but, he argues, in postulating a hypothetical dividend, stockholders who own common stock are the only ones to whom dividend equivalence can be an issue and, hence,

2. This provision affords capital gains treatment, without more, "if the redemption is in complete redemption of all of the stock of the corporation owned by the stockholder."

3. By virtue of 26 U.S.C.A. § 318(a) (1) (A), Richard was considered to have received the $2,000 paid in redemption of preferred stock to his wife, Annie.

the amounts distributed in redemption of preferred stock to shareholders who own only preferred stock must be eliminated in fixing the aggregate amount of the hypothetical dividend on common stock. If the Commissioner's urged adjustment of the aggregate amount of the hypothetical dividend is adopted, Joseph L. Antrim would have received (in round figures) $10,666, and Richard H. Cardwell, Jr. would have received (in round figures) $5,333, which, the Commissioner urges, are essentially equivalent to the $12,000 and $4,000 that they received respectively, on redemption of the preferred stock.[4]

Based upon the legislative history of § 302(b) (1), the Commissioner asserts that that section is intended only to benefit owners of preferred stock who own no common stock when there is a partial redemption of their preferred stock.[5] The Commissioner's argument, even if advanced,[6] has not been adopted by any court and we perceive three reasons why it should not be adopted. First, if Congress had intended to benefit only this narrowly defined class, it is reasonable to suppose that Congress would have created another specific "safe harbor" rather than to employ the general language "not essentially equivalent to a dividend." The further supposition that use of the general language was an expression of intent that § 302(b) (1) have wider scope than that urged by the Commissioner is equally justified. Second, as the Commissioner candidly, albeit contradictorily, states in his brief, the

concept of "divided equivalence" has meaning only where a common stockholder is involved. Section 302(b) (1) thus, by its terms, has application broader than that contended for by the Commissioner. Third, the Commissioner's construction would have the grossly unfair consequence of disallowing capital gains treatment under all circumstances where a taxpayer owned only one share of common stock but all or a portion of his preferred stock was redeemed. While gross unfairness is not determinative of the invalidity of the construction which the Commissioner presses, it is a result to be avoided if possible.

The legislative history of § 302(b) (1) and related provisions does show that Congress intended to create certain "safe harbors" (the present subsections (b) (2), (b) (3) and (b) (4) of § 302); but that in the course of enactment of the legislation, Congress concluded to retain the "essentially equivalent to a dividend" provision, § 302(b) (1), because the "safe harbors," standing alone, "appeared unnecessarily restrictive." S.Rep.No. 1622, 83rd Cong., 2d Sess. pp. 44–45; 3 U.S.C.Cong. & Adm.News (1954) pp. 4621, 4675. See Levin v. Commissioner of Internal Revenue, 385 F.2d 521, 524–525 (2 Cir. 1967). Significantly, however, we find nothing in that history to indicate that in those cases in which the hypothetical dividend test is appropriate, the aggregate amount of the hypothetical dividend is to be reduced by the amounts paid to stockholders who are in a "safe harbor." True, § 302(b) (5) states that

4. Under this computation Antrim received 8-⅓% more and Cardwell 8-⅓% less for redemption of their preferred stock than they would have received if a dividend on common stock had been declared. The Commissioner urges that these differences are less than ones which have been held not to destroy essential equivalence, citing Bradbury v. Commissioner of Internal Revenue, 298 F.2d 111 (1 Cir. 1962); Commissioner of Internal Revenue v. Berenbaum, 369 F.2d 337 (10 Cir. 1966), and 26 U.S.C.A. § 302(b) (2).

5. The § 302(b) (3) "safe harbor" which would otherwise be available to him is, by its terms, available only where there

is a *complete* redemption of all of his stock. We note, however, that § 1.302-2 (a) of the Income Tax Regulations (1968) gives, as the *only* example of a qualified § 302(b) (1) redemption, the redemption of one-half of the non-voting preferred stock of a shareholder who owns no shares of any other class of stock.

6. While the Commissioner quite strongly suggests this argument in several places in his brief, elsewhere the Commissioner advances other arguments which may be deemed either modifications thereof or alternative arguments. We deem it proper to deal with the argument at face value.

if a redemption fails to qualify for a "safe harbor" berth under subsections (b) (2), (b) (3) or (b) (4), that fact shall not be considered in determining whether it "is not essentially equivalent to a dividend" under (b) (1); but such a statement, in our view, falls short of indicating that the test of dividend equivalence must be applied by disregarding amounts paid to shareholders who have available a "safe harbor." Our analysis of the legislative history and the inferences which we draw from the use by Congress of the broad language "essentially equivalent to a dividend" persuades us that the implicit and explicit statements in prior cases about the aggregate base of the hypothetical dividend are still valid.

In *Ballenger*, as we have noted, we stated that the comparative hypothetical dividend should be in "the same amount" as the distribution on redemption. While in *Ballenger* the taxpayer was the sole owner of all of the preferred and common stock, in Northup v. United States, 240 F.2d 304, 306 (2 Cir. 1957), stockholders owning 74.7% of preferred stock owned no common stock; and yet it seems clear from a reading of the opinion that application of the hypothetical dividend on common stock test was premised on the aggregate amount of dividend on common stock as being equal to the total sum distributed in redemption of preferred. Himmel v. Commissioner of Internal Revenue, supra, 338 F. 2d pp. 817–819 (2 Cir. 1965), continued to look to total distribution in determining the effect of a hypothetical dividend even after enactment of the Internal Revenue Code of 1954.

The Commissioner urges us not to follow the direction to which these decisions point, and, instead, to reduce the total $80,000 redemption by the portion received by Miss Antrim ($64,000—which the Commissioner asserts is immaterial), because her stock could have been redeemed well in advance, or well after, redemption of taxpayers' preferred stock. Basically, his position is that where common stockholders are in the picture, the question of dividend equivalence turns on their positions each to the other and not with regard to those who own no voting stock.

■ To this argument there are several answers. In fact, Miss Antrim's stock was not redeemed either before or after redemption of the taxpayers' preferred stock. Indeed, under the charter of the corporation, it could not have been redeemed before, unless the taxpayers waived their right of redemption, or after, unless Miss Antrim waived her right of redemption. Miss Antrim's stock was redeemed as part and parcel of a total redemption of all preferred stock, including that held by the taxpayers. This statement does not place undue emphasis on form, ignoring substance, because it is clear that in its revision of § 302 Congress intended to introduce a measure of clarity into an otherwise confusing and confused area of the tax laws so that taxpayers by intelligent planning and literal compliance could achieve safe harbors and be entitled to capital gains treatment. Levin v. Commissioner of Internal Revenue, 385 F.2d 521, 525 (2 Cir. 1967). Of course, it is not a safe harbor provision which is involved here, but the legislative intent of facilitating tax planning would clearly be frustrated if every plan, regardless of its form, could be retrospectively altered by the Commissioner in determining its tax consequences.

■ There is a more basic flaw in the Commissioner's argument, however. Implied is the premise that in order to distribute $16,000 to themselves, taxpayers were required, or found it necessary to distribute $80,000. Nothing could be less the fact. If the ultimate object of the transaction had been to put $16,000 into their own hands, taxpayers were at liberty to declare a dividend of $16,000 on the corporation's common stock and to provide nothing for Miss Antrim. If the ultimate object were only to distribute $80,000, taxpayers could have even declared a dividend of $80,000 on the corporation's common stock, again providing nothing for Miss Antrim. By at-

tempting to bifurcate the distribution which did occur, the Commissioner's argument ignores the critical fact that the taxpayers received much less than they would have received had the total been devoted to the declaration of a dividend on common stock. Dividend equivalence, in our view, requires that hypothetical treatment of the *total sum* be considered.

In short, we think that the Commissioner asks us to compare apples with oranges. We find no warrant for his request in the language of § 302, its legislative history, in the precedents, or in logic. We agree with the Tax Court that when the hypothetical dividend test is used the aggregate amount of the hypothetical dividend is the same as the aggregate amount distributed in redemption, irrespective of whether a portion thereof finds a "safe harbor." The decisions of the Tax Court are

Affirmed.