*Decision will be entered under Rule 50.*

HOWARD P. BLOUNT AND DOLLY H. BLOUNT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5519–66.   Filed March 26, 1969.

*Robert V. Hunter*, for the petitioners.
*Stephen M. Miller*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

| TYE | Deficiency |
| --- | --- |
| 12/31/60 | $3, 078. 46 |
| 12/31/61 | 3, 624. 99 |
| 12/31/62 | 2, 141. 22 |
| 12/31/63 | 2, 264. 65 |

The sole question for decision is whether the distributions by the Blount Lumber Co. to the petitioners in redemption of their stock were taxable as a dividend. The petitioners have conceded another issue raised by the statutory notice of deficiency, and the third issue, relating to the deduction of medical expenses, depends solely on our resolution of the principal issue.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Howard P. Blount and Dolly H. Blount, are husband and wife, who resided in Lacona, N.Y., at the time the petition was filed in this case. They filed joint income tax returns for the taxable years 1960 through 1962 with the district director of internal revenue, Syracuse, N.Y., and for the taxable year 1963, with the district director of internal revenue, Buffalo, N.Y.

The Blount Lumber Co. was organized in 1908 by Howard's father, and since that time has been engaged in various phases of the lumber business, including production of hardwood flooring and millwork. Howard's father died in 1932, leaving majority control of the capital stock to Howard's mother. She became president of the company but was inactive in its operations.

The company's operations were controlled by Howard, by H. Floyd Blount, his brother, and by H. Wallace Parker, Howard's brother-in-law and husband of his and Floyd's sister. Prior to the death of Howard's mother in 1954, Howard and Floyd were vice presidents, and Wallace was treasurer; each had responsibility for parts of the company's operations. Since at least 1950, substantially all the stock in the company has been owned by Howard, Floyd, and Wallace, or members of their respective families.

The period prior to 1953 was marked by a high degree of dissension and disagreement among the men, particularly between Howard and Floyd. Their disagreements were of both a business and a personal nature and produced concern over the future of the company by the children of Howard, Floyd, and Wallace, who hoped to take over the company, and by T. B. Lundgren and H. J. Hoit, two key men in the company's operations. One concern was that such disagreements would lead to the company's stock falling into outside hands.

As of February 2, 1953, the company had authorized capital stock consisting solely of 3,000 shares of common stock, of which 2,420 shares were outstanding. On that date, a voting trust was created to obviate the possibility that Howard, Floyd, or Wallace would transfer his stock to an outsider or that two of the three would join forces to vote out the third. Each of the three family groups transferred a number of shares to the trust, to be voted by the trustee, Wendell Sprague, with the result that just over 50 percent of the company's outstanding shares was held by the trust. The voting trust was to, and did, continue until February 1, 1963, when it was dissolved.

After the death of his mother in 1954, Howard became president of the company; he continued to hold that position until his retirement. During this period, Floyd was vice president, Wallace was treasurer, and Theodore B. Lundgren was secretary. During the late 1940's and early 1950's, Howard's son, George R. Blount, Floyd's son, F. Thomas Blount, and Wallace's son, Robert E. Parker, became active in the affairs of the company. Although Howard, Floyd, and Wallace each had other children, some of whom worked for the company part or full time during the 1950's, it was decided, after some disagreement, that only one child from each family group should have a significant part in the ownership and management of the company. As of January 1, 1960, George, Thomas, Robert, their fathers, and Lundgren comprised the company's board of directors.

In the late 1950's, those active in the company expressed concern with three problems regarding the company's ownership and management: (1) That the shares of stock held by the children who were not active in the company should not be transferred to outsiders; (2) that means be provided for George, Thomas, and Robert to take over the ownership as well as the managerial responsibility from their fathers; and (3) that provision be made for the retirement of Howard, Floyd, and Wallace. On March 12, 1960, the company's stockholders elected a new board of directors, comprised of the members of the old board plus H. J. Hoit. Howard was elected chairman of the board. The newly constituted board elected Floyd as president and Robert as vice president. Wallace continued as treasurer and Lundgren as secretary.

On July 12, 1960, Howard, Floyd, and Wallace entered into an agreement with the company which had the stated purpose of providing for their retirement. It provided in pertinent part:

1. Howard P. Blount, H. Floyd Blount and H. Wallace Parker each agrees to retire from the active management of the corporation and its subsidiary, Blount-Parker Corp., not later than December 31st preceding his 68th birthday. Following his retirement, until his death, the corporation agrees that it and/or its subsidiary will pay to each man so retired an annual salary of $7,500.00 in recognition of his long and faithful service to such corporations; except that Howard P. Blount shall be paid an annual salary of $10,000.00 in each of his first two years following retirement, and $7,500.00 per year thereafter.

Howard demanded and received under the agreement a larger payment for the first two years after retirement because the agreement required him to retire sooner than the others. In accordance with the terms of the agreement, Howard, who became 68 years old on February 2, 1960, retired from the company on December 31, 1959.[1]

The agreement further provided:

3. In each of the years 1960 and 1961, the corporation agrees to purchase from Howard P. Blount and Dolly H. Blount, his wife, or either of them, up to twenty (20) shares in all of the corporation's common stock, the actual number of shares up to such maximum to be at the election of the seller. Thereafter, until the death of the survivor of them, the corporation agrees to purchase from Howard P. Blount and Dolly H. Blount, his wife, or either of them, up to fifteen (15) shares of such stock in all, in each year, the actual number of shares up to such maximum to be at the election of the seller. In each case, the price to be paid for such stock shall be determined as hereinafter set forth.

The plan contained identical provisions for the redemption of stock held by Floyd and Wallace and their wives—up to 20 shares could be redeemed in the first 2 years following retirement, and up to 15 shares in each year thereafter. In all cases, the redemption price of the stock was to be an amount equal to three-quarters of its book value at the close of the year preceding the redemption.

Pursuant to this agreement, the company redeemed shares held by Howard in the following amounts:

| Year | Number of shares redeemed | Proceeds of redemption |
|---|---|---|
| 1960 | 20 | $11,441.80 |
| 1961 | [1] 80 | 12,152.80 |
| 1962 | [1] 60 | 9,157.80 |
| 1963 | [1] 60 | 8,923.80 |

[1] On Dec. 28, 1960, the company's common stock was split 4 for 1. The redemptions for 1961 and subsequently are stated in terms of number of shares after the split.

A second stated purpose of the plan was to provide a means for the disposition of some of the stock held by Charles H. Blount, Floyd's son, who was also a party to the agreement. To this end, it provided that Charles could, at his option, redeem up to 10 shares of stock in each of 1960 and 1961, the redemption price to be three-quarters of the book value of such shares at the close of the year preceding the redemptions.

Also on July 12, 1960, the stockholders, in a special meeting, pursuant to a "plan of recapitalization," authorized the company to provide for the issuance of nonvoting preferred stock, in exchange for the common stock then held by those children who were not active in the operation of the company and by the William W. Parker Co., whose

[1] Floyd and Wallace were both younger than Howard, and Wallace retired from the company in 1963. The record does not disclose Floyd's age or when he was to retire and attain the redemption rights under the plan.

stock was owned by William W. Parker and his wife. The exchange so authorized was at the option of each shareholder, except that each could exchange no more than 225 shares of the common stock under this plan. Pursuant to this authorization, certain of the shareholders exchanged common shares for preferred shares as follows:

| | 1960 | [1]1961 | [1]1962 | | 1960 | [1]1961 | [1]1962 |
|---|---|---|---|---|---|---|---|
| Jean B. Culver | 80 | 39 | 24 | John A. Parker | 27 | | |
| Charles H. Blount | 133 | | | James B. Parker | 27 | | |

[1] The number of shares shown redeemed in 1961 and 1962 reflects the 4-for-1 stock split in December 1960.

In 1964, some of the preferred stock issued in exchange for the common was redeemed by the company. After this redemption, the nonactive children and the William W. Parker Co. had the following stock interests:

| | Common | Preferred |
|---|---|---|
| Jean B. Culver | None | None |
| Charles H. Blount | None | 640 |
| John A. Parker | None | None |
| James B. Parker | None | None |
| William W. Parker | 40 | None |
| William W. Parker Co | 172 | None |

The following table shows the ownership, including beneficial ownership in the shares held in the voting trust, of the outstanding common stock of the company as of July 12, 1960, and December 31, 1960, 1961, 1962, and 1963:

| Shareholder | 7/12/60 | 12/31/60[1] | 12/31/61 | 12/31/62 | 12/31/63 |
|---|---|---|---|---|---|
| *Howard P. Blount family group* | | | | | |
| Howard P. Blount (petitioner) | 493 | 1,856 | 1,697 | 1,578 | 1,478 |
| Dolly H. Blount (petitioner) | 135 | 540 | 540 | 540 | 540 |
| George R. Blount (son) | 272 | 1,088 | 1,128 | 1,163 | 1,203 |
| Jean B. Culver (daughter) | 71 | | | | |
| Total | 971 | 3,484 | 3,365 | 3,281 | 3,221 |
| *H. Floyd Blount family group* | | | | | |
| H. Floyd Blount | 410 | 1,600 | 1,561 | 1,506 | 1,451 |
| Charles Blount (son) | 133 | 40 | | | |
| Ednah T. Blount (wife) | 72 | 288 | 48 | 48 | 48 |
| F. Thomas Blount (son) | 133 | 572 | 851 | 906 | 961 |
| H. Floyd Blount Trust | 207 | 828 | 828 | 828 | 828 |
| Total | 955 | 3,328 | 3,288 | 3,288 | 3,288 |
| *H. Wallace Parker family group* | | | | | |
| H. Wallace Parker | 211 | 844 | 844 | 769 | 769 |
| Florence B. Parker (wife) | 80 | 256 | 256 | 256 | 256 |
| William W. Parker Co.[2] | 43 | 172 | 172 | 172 | 172 |
| Robert E. Parker (son) | 102 | 408 | 408 | 433 | 433 |
| William W. Parker (son) | 10 | 40 | 40 | 40 | 40 |
| J. A. Parker (son) | 19 | | | 25 | 25 |
| J. B. Parker (son) | 19 | | | 25 | 25 |
| Total | 484 | 1,720 | 1,720 | 1,720 | 1,720 |
| T. B. Lundgren | 5 | 20 | 20 | 20 | 20 |
| H. J. Hoit | 5 | 20 | 20 | 20 | 20 |
| Total shares outstanding | 2,420 | 8,572 | 8,413 | 8,329 | 8,269 |

[1] Figures shown for 12/31/60 and subsequently reflect the 4-for-1 stock split of Dec. 28, 1960.
[2] The stock in this corporation was owned by William W. Parker and his wife.

The following table shows the net changes in common stock owner-ship for each of the company's shareholders: [2]

| | 7/31/60 to 12/31/60 [1] | | 12/31/60 to 12/31/61 | 12/31/61 to 12/31/62 | 12/31/62 to 12/31/63 |
|---|---|---|---|---|---|
| *Howard's family* | | | | | |
| Howard | −116 | ( −29) | −159 | −119 | −100 |
| Dolly | 0 | | 0 | 0 | 0 |
| George | 0 | | +40 | +35 | +40 |
| Jean | −284 | ( −71) | 0 | 0 | 0 |
| Total | −400 | (−100) | −119 | −84 | −60 |
| *Floyd's family* | | | | | |
| Floyd | −40 | ( −10) | −39 | −55 | −55 |
| Charles | −492 | (−123) | −40 | 0 | 0 |
| Ednah | 0 | | −240 | 0 | 0 |
| Thomas | +40 | ( +10) | +279 | +55 | +55 |
| H. Floyd Blount Trust | 0 | | 0 | 0 | 0 |
| Total | −492 | (−123) | −40 | 0 | 0 |
| *Wallace's family* | | | | | |
| Wallace | 0 | | 0 | −75 | 0 |
| Florence | −64 | ( −16) | 0 | 0 | 0 |
| Parker Co | 0 | | 0 | 0 | 0 |
| Robert | 0 | | 0 | +25 | 0 |
| William | 0 | | 0 | 0 | 0 |
| J. A | −76 | ( −19) | 0 | +25 | 0 |
| J. B | −76 | ( −19) | 0 | +25 | 0 |
| Total | −216 | ( −54) | 0 | 0 | 0 |
| T. B. Lundgren | 0 | | 0 | 0 | 0 |
| H. J. Hoit | 0 | | 0 | 0 | 0 |
| Grand total | −1,108 | (−277) | −159 | −84 | −60 |

[1] The common stock was split 4 for 1 on December 28, 1960. The figures in parentheses represent changes in terms of the old stock while the figures not in parentheses state the change in terms of the new stock.

Howard's salary from the company for the years 1955 through 1959 was as follows:

| *Year* | *Salary* |
|---|---|
| 1955 | $11,000 |
| 1956 | 11,000 |
| 1957 | 11,000 |
| 1958 | 13,000 |
| 1959 | 9,000 |

Amounts received by Howard as retirement salary or pension pay-ments and in redemption for his stock in 1960 through 1963 were as follows:

| Year | Salary (pension payments under July 12, 1960, agreement) | Stock redemptions | Total |
|---|---|---|---|
| 1960 | $5,000 | $11,441.80 | $16,441.80 |
| 1961 | 5,000 | 12,152.80 | 17,152.80 |
| 1962 | 7,500 | 9,157.80 | 16,657.80 |
| 1963 | 7,500 | 8,923.80 | 16,423.80 |

The difference between the $5,000 pension payment made to Howard by the company in 1960 and 1961 and the $10,000 to which he was

[2] Discrepancies between this and the foregoing table and information given earlier, con-cerning changes in stock ownership occurring because of the recapitalization plan and retirement agreement, may be due to transfers of stock between family members.

entitled in those years under the 1960 retirement agreement was paid by the Blount-Parker Corp., a subsidiary of the company. After his retirement, Howard no longer had any active role in the running of the company. He attended two directors' meetings between his retirement and 1963 and performed no compensable services for the company in that time.

The company's taxable income for 1955 through 1963 was as follows:

| | |
|---|---|
| Year ended June 30, 1955 | $169,675.38 |
| Period ended Dec. 31, 1955 | 87,573.84 |
| Year ended Dec. 31— | |
| 1956 | 102,738.65 |
| 1957 | 29,857.76 |
| 1958 | 31,873.12 |
| 1959 | 182,553.91 |
| 1960 | 59,489.16 |
| 1961 | 74,271.92 |
| 1962 | (29,547.73) |
| 1963 | 15,899.51 |

Its accumulated earnings and profits[3] for that period appear on the following table:[4]

| | |
|---|---|
| Year ended June 30, 1955 | $930,683.60 |
| Period ended Dec. 31, 1955 | 976,672.09 |
| Year ended Dec. 31— | |
| 1956 | 1,033,278.44 |
| 1957 | 1,057,822.80 |
| 1958 | 1,083,088.03 |
| 1959 | 1,225,617.71 |
| 1960 | 1,263,507.14 |
| 1961 | 1,263,880.55 |
| 1962 | 1,236,997.69 |
| 1963 | 1,240,645.78 |

The company declared and paid formal dividends on its common stock in the 1940's totaling $8,000 in each of 3 years and $12,500 in each of 2 years. It has never declared and paid any other cash dividends on its common stock. The only formal dividends paid during 1961 to 1963 were paid on the preferred stock. Such payments totaled $7,142.50 in 1961, $7,380 in 1962, and $7,470 in 1963.

During the late 1950's and early 1960's, certain areas of the company's business were declining, while another, the millwork division, was expanding.

For each of the taxable years 1960, 1961, 1962, and 1963, Howard reported the difference between the amount received from the company in redemption of his company stock and his basis in that stock

---

[3] The amounts shown in the table were stipulated as "earned surplus and undivided profits," but the parties appear to agree that the amounts shown represent "accumulated earnings and profits" within the meaning of the internal revenue laws.

[4] This table does not reflect the transfer of $750,000 from earned surplus and undivided profits to capital stock upon the 4-for-1 stock split in 1960.

as long-term capital gain. In his statutory notice of deficiency, the respondent determined that amounts received in payment for the redeemed stock constituted dividend income.

OPINION

The question that we must decide is whether the redemptions of Howard's stock pursuant to the retirement agreement are to be treated as sales of such stock or whether the amounts which he received for the stock are to be treated as dividends. The answer turns on whether the redemptions are essentially equivalent to dividends within the meaning of section 302(b)(1) of the Internal Revenue Code of 1954.[5]

The tests of dividend equivalency have been stated in many Tax Court cases, and no useful purpose would be served to restate them here. See *Estate of Arthur H. Squier*, 35 T.C. 950 (1961), acq. 1961–2 C.B. 5; *Thomas G. Lewis*, 35 T.C. 71 (1960). The more important of these tests are whether there was a significant shift of ownership and control; whether there was an accumulation of earnings and profits sufficient to make the distributions; whether there was a history of significant dividend distributions; and whether the redemption was motivated by a substantial business purpose. No one test is conclusive, and the question is one of fact. *Ralph L. Humphrey*, 39 T.C. 199 (1962). [*Beatrice Levin*, 47 T.C. 258, 263 (1966), affd. 385 F. 2d 521 (C.A. 2, 1967).]

In the ordinary case, "the indispensable first step in * * * [determining dividend equivalency] is whether the redemption of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders." *Bradbury* v. *Commissioner*, 298 F. 2d 111, 116 (C.A. 1, 1962). In the present case, we must look not only at the particular redemptions before us, but also at the plan of which they were a part, to determine the existence of such a meaningful change. The retirement plan under which the redemptions before us were made gives the three major shareholders the opportunity to arrange their redemptions so as to withdraw cash from the company while leaving their relative interests unchanged. The fact that any particular redemption might work a temporary change in one of the shareholders' relative interests does not alter the nature of the plan.[6]

Under the retirement plan, Floyd and Wallace, the two other principal stockholders, acquired the same rights as Howard with respect to redemption: each could—but was not required to—have up to a stated number of shares redeemed each year. The sole difference in their rights was the time at which such rights became operable. Since

---

[5] All statutory references are to the Internal Revenue Code of 1954.

[6] We do not mean to say that the redemptions before us, standing alone, worked the kind of meaningful change which indicates a sale rather than a dividend. The respondent correctly observes that Howard's stockownership (including stock attributed to him by sec. 318) remained largely unchanged during the years before us—ranging between 40.7 and 39 percent of the outstanding stock of the Blount Lumber Co.

the three were of different ages, their retirement and the attainment of the redemption rights occurred at different times. If one of the three could not or chose not to redeem any or all of the stock allowable under the plan each year in order to maintain his relative interest in the company, the others could do likewise. The fundamental point is that the plan exerted no compulsion on any shareholder, but permitted Howard, Floyd, and Wallace each to fit his own redemptions into the pattern set by the others, and thus gave each complete power to prevent any decline whatsoever in his relative position.

It is true that Howard, Floyd, or Wallace could choose to have the maximum allowable amount of his stock redeemed although the others did not. The effect might be a change in his proportional ownership of the corporation. However, such a change would result from the elections made by the principal owners, and since they all had the same rights under the retirement plan, the fact that they might exercise their rights differently is not indicative that the redemptions were sales rather than dividends.

The accumulated earnings and profits and the lack of dividends distributed by the corporation are also indicative that the redemptions were essentially equivalent to dividends. For the years 1955 through 1963, the corporation had substantial accumulated earnings and profits —many times the amount of the redemptions. No formal dividends have been paid on the common stock since the 1940's, and only a relatively small amount was paid as dividends on the preferred stock, which was held only by people who owned no common stock.

The petitioners' principal argument is that the redemptions were motivated by a substantial business purpose. There is a difference of opinion among the courts as to the relevancy of a business purpose. In some cases, the courts have found that a redemption was a sale because it was motivated by a business purpose. *Perry S. Lewis*, 47 T.C. 129 (1966) ; *John A. Decker*, 32 T.C. 326 (1959), affd. 286 F. 2d 427 (C.A. 6, 1960). On the other hand, the Second Circuit has said that the business purpose test has been "minimized" in importance (*McGinty* v. *Commissioner*, 325 F. 2d 820, 822 (1963)), is not looked upon "with favor" (*Levin* v. *Commissioner*, 385 F. 2d 521, 526 (1967)), and is "irrelevant" (*Hasbrook* v. *United States*, 343 F. 2d 811, 814 (1965)). In this case, we need not attempt to resolve that dispute, because the petitioners have failed to convince us that the redemptions were motivated by a business purpose.

The petitioners argue that there were three business purposes for the retirement agreement and its provision for the redemption of the stock: (1) So that the stock would not be sold to outsiders; (2) so that control of the company could pass from Howard, Floyd, and Wallace to their sons; and (3) so that Howard, Floyd, and Wallace

would retire from the management of the company. We can not see how the redemption provisions of the plan would insure, or even significantly promote, the accomplishment of the first two claimed objectives. Howard, Floyd, and Wallace were under no compulsion to sell their stock to the corporation; so far as the record shows, they could sell it to anyone, including outsiders. Indeed, because of the limitations in the agreement, if any of them wished to sell a substantial amount of his stock at any one time, some of it would have to be sold to outsiders, unless the corporation voluntarily purchased more than was required under the retirement agreement. As to the stated objective of transferring control from one generation to the other, the agreement is not going to achieve such result very promptly. The members of the older generation were not required to dispose of their stock; and even if Howard and his wife redeem each year the maximum amount of stock allowable under the plan, it would take more than 40 years for their stock to be completely redeemed. In addition, no provision was made for transferring the stock into the hands of the younger generation. If the owners of the company truly wished to prevent sales of the stock to outsiders and to transfer control to the younger generation, they could have adopted far more effective means of accomplishing those objectives. The provisions of the retirement agreement would contribute so little toward the effectuation of such purposes that we cannot believe that they were the true reasons for the provisions.

The record does support a finding that a purpose of the redemption feature of the plan was to provide the retired shareholders with the means of obtaining cash supplements to their pensions. However, this purpose could have been accomplished more directly by having the plan provide for increased pensions; it constitutes no corporate business purpose for the redemption. *Beatrice Levin, supra.*

Since the petitioners have conceded other issues raised by the notice of deficiency,

*Decision will be entered for the respondent.*