Howard P. **BLOUNT** and Dolly H. Blount, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 234, Docket 33748.

United States Court of Appeals
Second Circuit.

Argued Nov. 5, 1969.

Decided Dec. 17, 1969.

---

Robert V. Hunter, Syracuse, N. Y., for appellants.

William L. Goldman, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Thomas L. Stapleton, Attys., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

This case concerns redemptions of stock of the Blount Lumber Company, organized in 1908 by the father of taxpayer, Howard Blount.[1] On his death in 1932, the father left majority control to his widow. Although she became president, the business was conducted by Howard Blount, his brother H. Floyd Blount, and their brother-in-law, H. Wallace Parker. Since 1950 the three men and their families have owned substantially all the stock.

During the early 1950's Howard's son George, Floyd's son F. Thomas, and Wallace's son Robert became active in the company. After some disagreement it was decided that they alone of their generation would make their careers there. As the decade wore on, the management became concerned with develop-

---

1. The facts are more fully set forth in the opinion of the Tax Court, 51 T.C. 1023 (1969). We have limited ourselves to the essentials.

ing a program to accomplish three objectives. One was to buy up the shares owned by members of the third generation who were not active in the company. A second was to provide means for George and Thomas Blount and Robert Parker gradually to take over ownership as well as management. A third was to provide for the retirement of Howard and Floyd Blount and Wallace Parker.

On July 12, 1960, the three seniors entered into an agreement with the company having the stated purpose of providing for their retirement. Each agreed to retire not later than the December 31 preceding his 68th birthday. Thereafter each was to receive an annual salary of $7500 until death, except that Howard, the eldest, who retired as of December 31, 1959, was to receive $10,000 for the first two years. The agreement further provided—and here is the rub—that the company would purchase from each man or his wife up to 20 shares of common stock in each of the first two years after retirement and up to 15 each year thereafter, at a price equivalent to three-quarters of the book value at the previous year-end. Charles Blount, one of Floyd's sons, could similarly redeem up to 10 shares in 1960 and 1961. At the same time the company offered each of the children who were not active in its operation and the

William W. Parker Company (whose stock was owned by one of Wallace's sons and his wife) an opportunity to exchange not more than 225 shares of common stock for non-voting preferred. Howard's daughter, Floyd's son Charles and two of Parker's sons took advantage of this option; in 1964 all of the preferred so issued except Charles' was redeemed.

In each of the years 1960–63 Howard Blount availed himself of his right to redeem the maximum number of shares permitted. He reported the difference between the amounts received for redemptions and his basis as long-term capital gain. The Commissioner determined the distributions to be ordinary income, and the Tax Court so held.

A few further facts should be recited. The Commissioner contends that in determining whether the redemptions were essentially equivalent to dividends, § 302 (c) requires application of the attribution rules of § 318, and petitioners do not challenge this. See Levin v. C. I. R., 385 F.2d 521 (2 Cir. 1967), but see Mickey and Holden, Distributions Essentially Equivalent to a Dividend, 43 N.C.L.Rev. 32, 43–47 (1964). On that basis the number of common shares owned by the three family groups and the total outstanding, giving effect to a 4–1 split in December 1960, were as follows:

| | 7/12/60 (new shares in parentheses) | 12/31/60 | 12/31/61 | 12/31/62 | 12/31/63 |
|---|---|---|---|---|---|
| Howard P. Blount Group | 971(3884) | 3484 | 3365 | 3281 | 3221 |
| H. Floyd Blount Group | 955(3820) | 3328 | 3288 | 3288 | 3288 |
| H. Wallace Parker Group | 484(1936) | 1720 | 1720 | 1720 | 1720 |
| Subtotal | 2410(9640) | 8532 | 8373 | 8289 | 8229 |
| Total Outstanding | 2420(9680) | 8572 | 8413 | 8329 | 8269 |

These figures reflect the redemption of 20 of Howard's old shares in 1960, of 80 of the new shares in 1961 and of 60 in each of 1962 and 1963 as well as the exchanges of common for preferred made by various children, hereinbefore de-

scribed.[2] Wallace Parker retired in 1963. The record is silent concerning the retirement date of Floyd Blount, Wallace's and Floyd's exercise of their retirement rights, and the ages of their wives. Howard Blount's wife became 65 in 1962.

Our review necessarily begins with the language of the statute. Putting §§ 301(a), 301(c) (1), and 316 of the 1954 Code together, we learn that except as otherwise provided, a distribution of property made by a corporation to a shareholder with respect to its stock shall be included in gross income to the extent that the distribution is made out of earnings and profits, and that with exceptions not here relevant every distribution is out of earnings and profits to the extent thereof. (It is stipulated that the Blount Lumber Company had sufficient earnings and profits to cover the distributions here in issue.) The taxpayers allege that they fall within the exception created by § 302. Section 302(a) announces a general rule that "if a corporation redeems its stock * * * and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock." Then § 302(b) (1) says, in the backhanded way beloved by the framers of the Code, that "Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend." Section 302 (d) completes the circle by providing that "if a corporation redeems its stock * * * and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies."

■ In determining dividend equivalence here, the first step is to decide which transactions are relevant. Taxpayer contends that we should look only at the effect of Howard's redemptions during the years in question here. The Commissioner argues that we should view all the redemptions contemplated by the retirement agreement as part of a single plan, and base our determination on the effect of the entire series. We think the Commissioner's view is correct. It is specifically provided with respect to qualifying under § 302(b) (2), see subparagraph (D), and Congress could hardly have meant qualification under § 302(b) (1) to be easier in this regard. See Pacific Vegetable Oil Corp. v. C. I. R., 251 F.2d 682 (9 Cir. 1957), and, for cases where the principle of looking beyond the tax years in question was applied in favor of the taxpayer, Giles E. Bullock, 26 T.C. 276, 295 (1956), aff'd *per curiam*, Bullock v. Commissioner of Internal Revenue, 253 F.2d 715 (2 Cir. 1958); and Lukens' Estate v. C. I. R., 246 F.2d 403 (3 Cir. 1957).

It is clear enough that if A, B, and C each owned 1000 common shares in a company with 3000 shares outstanding and adopted a plan whereby each would redeem 100 shares a year over a three-year period, the redemptions would be essentially equivalent to a dividend even if the three-year periods were consecutive rather than concurrent. The question thus becomes whether the instant case differs sufficiently from the hypothetical to call for a different result. The differences are as follows:

(1) The stockholders had an option as distinguished from a contract for redemption;

(2) The Parkers received the same redemption privileges as the Howard and Floyd Blounts although their

---

2. The proportion of the common stock owned by the Howard Blount family group for each year is as follows:

|  | Before Redemption |
|---|---|
| 1960 | 40.1% |
| 1961 | 40.7 |
| 1962 | 40. |
| 1963 | 39.4 |
|  | After Redemption |
| 1964 | 39.0 |

The increase in 1961 despite the redemption was due to the decrease in total number of common shares as a result of the exchange of some of the common into the preferred and a disproportionate exercise of the exchange privilege by Charles Blount, a member of the H. Floyd group.

stock ownership was only about half as much; and

(3) The amount of stock redeemable by each family would vary in accordance with the length of time by which not only the three men but their wives survived the date of compulsory retirement.

 Neither the first nor the second factor has much weight. The opportunity to obtain cash for stock in a closely held corporation, which had not paid dividends in the last 20 years, was attractive enough for men retired on modest pensions and for their widows that exercise of the options would appear almost inevitable.[3] With respect to (2), the fact that Parker would be redeeming more than his pro rata share actually makes the conclusion of dividend equivalence easier to reach as regards the Blounts (although we do not mean by this that we would come to a different conclusion with respect to the Parkers on the facts before us). The point of the dividend equivalence test is to tax as dividends those redemptions in which the surrender of stock is basically a meaningless transaction signifying no substantial change in the stockholder's ownership rights. See Himmel v. C. I. R., 338 F.2d 815 (2 Cir. 1964). This is clearly the case where the redemption is pro rata. Where the redeeming shareholder surrenders less than his pro rata share, his ownership percentage actually goes up as a result of the redemption. As we have observed before, "this is most unlike a sale," Levin v. C. I. R., *supra*, 385 F.2d at 527–528, and dividend treatment is appropriate. As to (3), the men's expectancies with respect to the period of redemption were equal from an actuarial standpoint, cf. Gelb v. C. I. R., 298 F.2d 544, 551 n. 7 (2 Cir. 1962), although, of course, matters might not work out that way. While the record gives no information concerning the ages and consequent expectancies of the wives, it is not unreasonable to assume that they would be approximately the same age when their husbands retired. If the facts were significantly different, the taxpayers had the burden of showing this. Tax Ct.Rule 32. We accordingly need not decide whether a large difference in the expectancy would make the planned series of redemptions so disproportionate as to justify capital gains treatment. Moreover, we know that Mrs. Howard Blount is not so young that there is any actuarial likelihood of disproportionately high redemption by the taxpayers here.

The petition for review is denied and the judgment is affirmed.

---

3. At least this would be so unless the option holders had substantial investment income which the record does not reveal.