**Wayne E. BROWN and Mary Ruth Brown, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 68–228.**

United States District Court,
S. D. Ohio, E. D.

June 8, 1972.

H. Thompson Nicholas, Cincinnati, Ohio, Bruce W. Powell, Columbus, Ohio, for plaintiffs.

Thomas R. Jones, Tax Division, Dept. of Justice, Washington, D. C., William W. Milligan, U. S. Atty., Columbus, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

I

### FINDINGS OF FACT

(1) Plaintiffs Wayne E. Brown and Mary Ruth Brown, husband and wife, filed a joint tax return for the year 1964. A deficiency in the sum of $10,216.43 was assessed against them for the year 1964 by the Internal Revenue Service and the deficiency was subsequently paid. A timely claim for refund of the deficiency assessed and paid was filed by the plaintiffs and subsequently disallowed by the Internal Revenue Service. On July 12, 1968, the complaint in the above entitled matter was filed in the United States District Court for the Southern District of Ohio. All procedural steps necessary for a full determination of this matter on its merits have been taken and it is before the United States District Court for adjudication.

(2) Big Bear Stores Company is an Ohio corporation, incorporated in November, 1933. Prior to June of 1950, the common stock in said corporation was owned either legally or beneficially by the Miller family or the Brown family, 932 shares of 3500 outstanding being owned either by Wayne E. Brown, Mary Ruth Brown, or their daughter Marilyn.[1] At such point in time a previous issue of 2,000 shares of first preferred stock, par

---

1. Although Marilyn Brown Kellough is not a party to this action, it is conceded that her shares must be deemed beneficially owned by plaintiffs, under the attribution rules of section 318 of the Internal Revenue Code, made applicable to section 302. See, e. g., Levin v. Commissioner of Internal Revenue, 385 F.2d 521 (2d Cir. 1967).

value of $100 per share, dated 1943, had been retired in full.

(3) On June 20, 1950, articles of incorporation of the Big Bear Stores Company were amended to provide for 3500 shares of $100 par value second issue preferred stock. This was intended to be and was in fact a stock dividend since it was issued pro rata without additional consideration on all shares of common stock outstanding.[2] On June 20, 1950, the Brown family acquired 932 shares of 3500 outstanding. On the same date, additional stock was issued at the rate of 50 shares of Class A common and 50 shares of Class B common, in exchange for each share of common stock then owned. The only difference between Class A and Class B common stock was that Class B had voting rights of one vote per share, while Class A had none.

(4) In 1957, the Brown interests gained voting control of Big Bear Stores Company. At this time, the second issue preferred stock issued in 1950 was redeemed and a new issue of "prior preferred" stock was authorized. 410 shares of the 1950 preferred stock had been redeemed between 1950 and 1957, 200 of such shares by the Miller interests in 1956 and 1957. Holders of the remaining 3090 shares of that stock in 1957 were granted the option either to redeem for cash or substitute the 1957 prior preferred stock on a share for share basis.

(5) Between 1957 and 1967,[3] 1066 more shares of the newly issued prior preferred stock were redeemed, by a number of individual public shareholders. On February 29, 1964, the corporation redeemed 200 shares of plaintiffs' prior preferred for $21,000.00. In that year only 230 shares in total were redeemed.

(6) As of February 28, 1964, immediately before corporate redemption of 200 shares of the Browns' stock, the per-centage of shares held by the Brown family was as follows: Class A stock—11.7%; Class B stock—99.3%; Prior Preferred stock—34.01%.

(7) Redemption of the Browns' preferred stock had no effect on either their percentage of voting control nor their proportionate ownership of common stock. Between February 28, 1964, the date of the 200 share redemption, and February 29, 1964, the following day, the Brown family's percentage of prior preferred dropped from 34.01% to 29.2%. In 1950, before any stock was redeemed, the Brown family's proportionate ownership of the original second issue preferred was 26.63%. As of 1967, after 1066 of the prior preferred had been redeemed, their proportionate ownership of preferred had risen to 35.47%.

(8) The preferred stock issued in 1950 and the prior preferred stock reissued in 1957 were both subject to the same limitations: redemption was at the option of the Company at the rate of $105.00 per share. A sinking fund for redemption purposes was required, with an annual deposit from net earnings of a sum equal to the redemption value of 100 shares. Redemption of less than all the outstanding shares to be determined in a fashion selected by the corporate Board of Directors. Thus, the holders of preferred stock had no right to demand redemption and the company was under no obligation to redeem the shares, or any specific share, at any particular point in time.

(9) No sinking fund was ever established, as required by the 1950 and 1957 amended articles of incorporation. Instead, the corporation complied with these provisions by redeeming shares directly from stockholders at a rate of 100 per year until such issue was retired. Up until 1964, shares had been voluntarily turned in for redemption in sufficient quantities to satisfy the sinking

---

2. In addition, $350,000.00 was transferred from earned surplus to stated capital, based upon 3500 shares of preferred at par value of $100 per share.

3. See Plaintiffs' Exhibit 3 of Exhibit B, attached to their complaint. This action was filed in 1968 and the corporate redemption figures for 1968 to the present date have not been filed with the Court.

fund provisions. The 1964 redemption of the stock transpired when a corporate accountant discovered that the company was 200 shares behind in its schedule and requested plaintiff Wayne Brown to make up this deficiency. Plaintiff agreed and these were the only shares he has ever redeemed.

(10) In 1964, when the plaintiff agreed to redemption of his stock, the corporation had an earned surplus in excess of Seven Million ($7,000,000.00) Dollars, sufficient to cover the distribution here in issue.

II

OPINION

This case concerns the redemption in 1964 of 200 shares of preferred stock owned by taxpayers in the Big Bear Stores Company. The sole question presented is whether this redemption was "essentially equivalent to a dividend," within the meaning of Section 302(b) (1) of the Internal Revenue Code of 1954[1] and therefore subject to taxation as ordinary income under related sections of the Code, or rather a payment in exchange for ownership of stock (i. e. a sale), entitled to more favorable capital gains taxation.

▮ The legislative history and purposes of section 302(b) (1) have been thoroughly analyzed by other courts, and it is not necessary to repeat that process here. It is sufficient to say that, as recently announced by the Supreme Court, the fundamental test in determining dividend equivalency under section 302(b) (1) is whether the distributions have the "net effect" of a dividend; that is, whether "the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stock-

holders." See, United States v. Davis, 397 U.S. 301, 313, 90 S.Ct. 1041, 1048, 25 L.Ed.2d 323 (1970). See, generally, Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611 (1945). Where redemptions have resulted in a *meaningful reduction* of the redeeming shareholder's proportionate interest in a corporation, or have effected a distribution of earnings and profits to him which is not reasonably pro-rated in relation to other shareholders' proportionate interests, they have been viewed as more resembling a sale than a dividend. See, Himmel v. Commissioner of Internal Revenue, 338 F.2d 815 (2d Cir. 1964); Sorem v. Commissioner of Internal Revenue, 334 F.2d 275 (10th Cir. 1964); Ballenger v. United States, 301 F.2d 192 (4th Cir. 1962); Cobb v. Callan Court Co., 274 F.2d 532 (5th Cir. 1960); Northup v. United States, 240 F.2d 304 (2d Cir. 1957).

Additional factors previously considered by courts, such as who initiates the redemptions and how significantly they contract corporate operations, see, generally, 1 Mertens § 9.100, at 214–215, if they have any continuing vitality at all, must be considered subordinate to the "net economic effect" test enunciated in *Davis, supra.* The business purpose or motive of the corporation in undertaking stock redemptions is expressly made irrelevant by that case.

In the case at bar, resolution of the dividend equivalency issue is made more difficult by the presence of two complicating factors: First, the redemptions in this case took place over an extended period of time and involved two separate issues of stock. Second, the capitalization structure of Big Bear Stores Company was multivariated and complex.

---

1. 302. *Distributions in redemption of stock*

    (a) *General rule.*—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

    (b) *Redemptions treated as exchanges.*

      —

    (1) *Redemptions not equivalent to dividends.*—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

In a case of this sort, the threshold question is to decide which transactions are relevant. Most of the section 302(b)(1) cases our research has uncovered have involved a single redemption, or at most two redemptions, in one or two consecutive tax years. In these cases, it is a simple matter, at least relatively, to compare the economic relationship of the taxpayer to the corporation before and after his stock has been redeemed. In contrast, cases involving multiple redemptions, pursuant to a single plan and carried out over a number of years, have been relatively few. See, In re Lukens' Estate, 246 F.2d 403 (3d Cir. 1957); Cobb v. Callan Court Co., *supra;* Northup v. United States, supra; Blount v. Commissioner of Internal Revenue, 425 F.2d 921 (2d Cir. 1969). In *Northup,* the Second Circuit Court of Appeals focused without discussion upon three specific tax years in question even though the redemption plan adopted by the corporation remained in effect for twelve years, terminating only when the entire issue of preferred stock was retired. On the other hand, the Third Circuit in *Lukens' Estate* and the Fifth Circuit in *Cobb* looked over the entire course of redemption in making their determination of dividend equivalency.

No court, however, had expressly addressed itself to this question until Judge Friendly, for the Second Circuit, did so in Blount v. Commissioner of Internal Revenue, *supra.* Holding that the overall economic effect of a series of redemptions upon the taxpayer is the relevant inquiry, the Court stated as follows:

In determining dividend equivalence here, the first step is to decide which transactions are relevant. Taxpayer contends that we should look only at the effect of Howard's redemptions during the years in question here. The Commissioner argues that we should view all the redemptions contemplated by the retirement agreement as part of a single plan, and base our determination on the effect of the entire series. We think the Commissioner's view is correct. It is specifically provided with respect to qualifying under § 302(b)(2), see subparagraph (D),[4] and Congress could hardly have meant qualification under 302(b)(1) to be easier in this regard. See Pacific Vegetable Oil Corp. v. C. I. R., 251 F.2d 682 (9 Cir. 1957), and, for cases where the principle of looking beyond the tax years in question was applied in favor of the taxpayer, Giles E. Bullock, 26 T.C. 276, 295 (1956), *aff'd* per curiam, Bullock v. Commissioner of Internal Revenue, 253 F.2d 715 (2 Cir. 1958); and Lukens' Estate v. C. I. R., 246 F.2d 403 (3 Cir. 1957). [footnote added] Id., 425 F.2d at 924.

The *Blount* decision has the effect of impliedly overruling the contrary approach earlier adopted by the Second

---

4. Sections 302(b)(2) and 302(b)(2)(D), concededly not directly applicable to the present case, provide in part as follows:

302(a) *General rule.*—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) *Redemptions treated as exchanges.*—

* * * * *

(2) *Substantially disproportionate redemption of stock.*—

(A) In general.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

* * * * *

(D) Series of redemptions.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

Since the "substantially disproportionate distribution" criterion of § 302(b)(2) has been made a controlling factor in determining dividend equivalency under § 302(b)(1), see United States v. Davis, *supra,* logic dictates that the provisions of subsection D apply to 302(b)(1) cases as well.

Circuit in *Northup, supra.* In any event, this Court finds the reasoning in *Blount* persuasive and controlling in the present case.

The problems in determining dividend equivalency, while always difficult, are further exacerbated when, as in the present case, the capital structure of the redeeming corporation is diversified and various classes of stock are held in different proportions by different stockholders. See, generally, Himmel v. Commissioner of Internal Revenue, *supra.* As the *Himmel* case recognizes, ownership of stock involves various rights—the right to vote, to participate in earnings and surplus and to share in net assets on liquidation—not all of which accrue to the holders of limited stock. *Id.,* 338 F.2d at 817. Whereas dividends on common stock give rise to pro-rata distributions of earnings and profits, or, in the case of stock dividends, to proportional distributions of equity not affecting basic shareholder relationships, the effect of redeeming preferred stock will depend upon the exact preferences and limitations upon such stock and may cause different changes in a shareholder's total rights than redemption of common. In order to determine dividend equivalency, the Court in *Himmel* compared the precise effect upon a preferred shareholder of redemption of his preferred stock to the effect that a hypothetical dividend on common stock would have had upon his and other shareholders' rights. See also, Commissioner v. Estate of Antrim, 395 F.2d 430 (4th Cir. 1968); Northup v. United States, *supra.* Plaintiffs in this case would have us adopt this approach. Discussion of the *Himmel* case appears below.

An application of the above stated principles to the facts of this case shows that over the period of years during which the Big Bear Stores' redemption plan was in effect, taxpayers surrendered *less* than their pro rata share of preferred shares, with the result that their ownership percentage of preferred actually increased rather than decreased. The number of shares owned by the Brown family and their relative percentage of the entire outstanding issue at various key points in time was as follows:

| | 6/20/50 * | 1/16/57 ** | 2/29/64 *** | 2/25/67 **** |
|---|---|---|---|---|
| Brown family | 932 (26.63%) / 3500 | 932 (30.16%) / 3090 | 732 (29.16%) / 2510 | 732 (35.47%) / 2024 |

* Institution of redemption plan for second issue preferred.
** Remaining unredeemed 3090 shares of second issue preferred retired; prior preferred issued on share for share basis; redemption plan continued.
*** 200 shares of Brown family stock redeemed.
**** Last date supplied to Court; total of 2024 shares not yet redeemed.

■ Even assuming *arguendo* that our inquiry were limited to the change in the Browns' proportionate ownership of preferred stock between the years 1957 and 1964, we could not conclude that the resultant 1% decrease in their ownership in these years constituted a *"meaningful* reduction" of their "proportionate interest in the corporation," as required by the Supreme Court in the Davis case. 397 U.S. at 313, 90 S.Ct. 1041 (emphasis supplied). No case presenting similar facts that we have found has so concluded. See, *passim,* Himmel v. Commissioner of Internal Revenue, *supra,* 338 F.2d at 818–819.

■ Viewing, as we must, the redemption plan in its entirety, we find that the taxpayers have not parted with anything which would justify capital gains treatment of the cash they received on redemption. See, Levin v. Commissioner of Internal Revenue, 385 F.2d 521, 527–528 (2d Cir. 1967). It has been observed that section 302(b)

(1) must be construed narrowly since "its major function was the narrow one of immunizing redemptions of minority holdings of preferred stock." See, Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders (2d ed.), 291. Courts have accordingly recognized that where a shareholder's proportionate ownership is actually increased as a result of a redemption plan, the outcome "is most unlike a sale." and capital gains treatment is inappropriate. Levin v. Commissioner of Internal Revenue, *Id.*, at 527; Blount v. Commissioner of Internal Revenue, *supra.* In such a series of transactions, as presented in the case at bar, the taxpayer gives up nothing in the way of corporate ownership and control, but nevertheless comes into possession of a sum of money, distributed to him out of the earnings of the corporation. This money is "essentially nothing but a dividend and is properly taxed as such." See, Wiseman v. United States, 371 F.2d 816, 818 (1st Cir. 1967); Coyle v. United States, 415 F.2d 488 (4th Cir. 1968).

We reach this result not without difficulty, for an application of the "hypothetical dividend" test enunciated in *Himmel, supra,* leads to a different conclusion. After corporate reorganization in 1957 and up to and including 1964, taxpayers' proportionate ownership of common stock, both Class A and Class B, approximated 55%. During these years, 580 preferred shares were redeemed, at a total par value of $58,000.00. Only 200 of plaintiffs' shares were redeemed, at a par value of $20,000.00. Thus, plaintiffs received only 34.5% of the redemption of preferred; whereas, had a dividend on common stock been distributed, they would have been entitled to a proportionate share of 55%.

There is no evidence that the Browns or any other stockholders were required to give up their shares for redemption in proportion to their relative interests in the corporation. What little evidence has been presented suggests that these redemptions were not intended to be made on a pro rata basis but rather were haphazard and voluntary on the part of shareholders.

Nevertheless, in analyzing the strict net economic effect of the transactions in the present case, we can only conclude that the redemption of taxpayers' preferred stock, no matter how fortuitous, did not meaningfully reduce their proportionate interest in the corporation, and that therefore, under the rule set out by the Supreme Court in United States v. Davis, *supra,* the cash received for such stock cannot qualify for capital gains treatment. To the extent that Himmel v. Commissioner of Internal Revenue, *supra,* sets out different criteria for determining dividend equivalency, we do not think that it can be reconciled with the clear language of *Davis* and we decline to follow its holding.

### III

### CONCLUSIONS OF LAW

Accordingly, the Court holds that the cash received by plaintiffs in 1964 in exchange for redemption of their preferred stock in Big Bear Stores Co., Inc. was "substantially equivalent to a dividend" within the meaning of Section 302(b) (1) of the Internal Revenue Code of 1954, and hence was taxable as ordinary income to plaintiffs. The assessment and collection of Ten Thousand, Two Hundred Sixteen and $^{43}/_{100}$ ($10,216.43) Dollars by the Internal Revenue Service by plaintiffs was therefore correct, and plaintiffs' claim for refund of taxes alleged to have been erroneously collected is hereby denied.

It is so ordered.