William F. and Gwendolyn WRIGHT,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 72–1562.

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1973.
Decided July 26, 1973.

Ernest J. Brown, Atty., Tax Div., Dept. of Justice, Washington, D.C., for appellant.

Raymond R. Morris, Little Rock, Ark., for appellee.

Before GIBSON, BRIGHT and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

The question presented on this appeal is whether or not "boot", in the form of a promissory note, received in connection with a corporate consolidation and reorganization is taxable as an ordinary dividend under 26 U.S.C. § 356(a)(2) or as a distribution entitled to capital gain treatment under 26 U.S.C. § 356(a)(1).

The District Court[1] decided that the distribution was entitled to capital gain treatment. We affirm.

Initially, the plaintiffs[2] contended that the consolidation and reorganization of the involved corporations resulted in an exchange of stock for stock and securities that qualified under the non-recognition of gain provisions of § 351 of the Code. The taxpayer does not appeal the ruling of the District Court that the promissory note involved constituted "boot" and was taxable as a gain and in his brief now concedes the note to be a distribution pursuant to a corporate reorganization under § 368(a)(1)(A) of the Code.

The "boot" consisted of a promissory note in the amount of $102,002 received by taxpayer as a result of the reorganization of two closely held corporations in 1963 into a single new corporation. Prior to the reorganization in 1963, the taxpayer and Leonard Dunn, a field superintendent employed by the taxpayer, controlled and operated Danco Construction Company (Danco), an Arkansas corporation in the business of laying waterlines, sewers, and utility cables. From 1959 until 1963, Danco's 151 shares of stock were owned by the taxpayer (108 shares or 71.5 per cent), Dunn (42 shares or 27.9 per cent), and John Thurman, Sr., one of the taxpayer's attorneys (one share or .6 per cent).

The taxpayer also had controlling interest in F & G Construction Company (F & G), also an Arkansas corporation engaged in construction. From 1957 until 1963, F & G's 240 shares were owned by the taxpayer (238 shares or 99.2 per cent), the taxpayer's wife (one share or .4 per cent), and John Thurman, Sr. (one share or .4 per cent).

In addition to Danco and F & G, the taxpayer controlled a third corporation,

World Wide, Inc. (World Wide), originally organized to engage in the automobile business but by 1963 limited to leasing equipment to Danco. In 1963, World Wide's 1,077 shares were owned by the taxpayer (603 shares or 56 per cent), Dunn (323 shares or 30 per cent), Mrs. W. F. Wright, Sr., the taxpayer's mother (150 shares or 13.9 per cent), and John Thurman, Jr., also an attorney for the taxpayer (one share or about .0009 per cent).

In late 1962 and early 1963, the taxpayer was considering a consolidation of F & G and World Wide in order to diversify and expand the business of the two corporations. The taxpayer and Dunn wanted the new corporation, eventually named Omni Corporation (Omni), to be owned in approximately the same proportionate basis as Danco, which was owned 71.5 per cent by the taxpayer and 27.9 per cent by Dunn. By simply consolidating F & G and World Wide with the shareholders of both corporations exchanging their shares solely for Omni shares, the taxpayer would have owned approximately 85 per cent of Omni and Dunn would have owned approximately 10 per cent. Such a reorganization would have been tax-free,[3] however it would not have accomplished the desired percentage ownership in the new corporation contemplated by the taxpayer and Dunn. On April 1, 1963, F & G's capital stock was worth $24,000 and its earned surplus was $101,802. At the same time World Wide's capital stock was worth $21,540 and its earned surplus was $38,365. The taxpayer and Dunn did not want a consolidation that would simply exchange shares of the two previous corporations solely for shares of Omni, for that would not result in the percentage ownership desired by the taxpayer and Dunn.

---

1. The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas, presided in this court-tried case.

2. The plaintiffs are husband and wife, and Mrs. Gwendolyn Wright is a party to this

suit since she filed a joint income tax return with her husband for 1963. Hereinafter "taxpayer" will refer to Mr. W. F. Wright, Jr., the husband.

3. 26 U.S.C. §§ 354, 361, and 368(a)(1)(A).

In order to effectuate the announced purposes of ownership of Omni on the similar proportionate basis of Danco and of allocation of the equities of F & G and World Wide as previously held, a Plan of Consolidation (Plan) was adopted by the shareholders of F & G and World Wide on March 1, 1963. According to the Plan, F & G and World Wide were dissolved and their assets and liabilities transferred to Omni. In addition Dunn was required to pay $7,005.57 to Omni,[4] and Omni issued on March 15, 1963, a promissory note for $102,002 payable to the taxpayer on or before March 15, 1973, and bearing five per cent interest. Omni issued the following shares:

| | Class "A" | Class "B" | Total Shares | Par Value |
|---|---|---|---|---|
| W. F. Wright, Jr. (taxpayer) | 223 | 1,999 | 2,222 | $55,500 |
| Leonard Dunn | 100 | 900 | 1,000 | 25,000 |
| Mrs. W. F. Wright, Sr. | 33 | 301 | 334 | 8,350 |
| Mrs. W. F. Wright, Jr. | 2 | 19 | 21 | 525 |
| John Thurman, Sr. | 2 | 21 | 23 | 575 |
| | 360 | 3,240 | 3,600 | $90,000 |

This Plan left the taxpayer with a 61.7 per cent ownership in Omni and Dunn with a 27.8 per cent interest.

The disputed issue is whether the taxpayer's receipt of the $102,002 note from Omni constituted "boot" to the taxpayer that should be treated as an ordinary dividend under 26 U.S.C. § 356(a)(2)[5] (thus taxable at ordinary income tax rates) or as a gain under § 356(a)(1) (taxable as a capital gain).

The Commissioner determined that the note should be considered a dividend under 26 U.S.C. § 356(a)(2) and assessed the taxpayer an additional income tax of $69,683.55 plus interest for the taxable year 1963. On June 16, 1967, the taxpayer paid the deficiency assessment and interest and on July 7, 1967,

filed a claim for refund which was disallowed by the Commissioner on September 14, 1967. The plaintiffs commenced this action in the District Court on December 28, 1967, under 26 U.S.C. § 1346(a)(1) to recover income taxes erroneously assessed and collected by the Commissioner.

The District Court concluded that the note was " 'boot' under § 356, with its fair market value to be recognized as gain to the taxpayer." However, the District Court in interpreting § 356(a)(2) held that the distribution of the note to the taxpayer did not have the effect of a dividend, because "Wright's interest in the corporation emerging from the consolidation was substantially reduced, from about 85 per

4. The Commissioner points out on appeal that the taxpayer's interest in Omni diminished from 85 per cent to 82 per cent by the contribution of this $7,005.57 in equity capital by Dunn. Under the facts of this case, the use of 82 per cent instead of 85 per cent would make no difference in this decision.

5. That subsection reads:
"(a) Gain on Exchanges.—
 * * * * *
 "(2) Treatment as Dividend.—If an exchange is described in paragraph (1)

but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property."

cent in the combining corporations to about 62 per cent of Omni." [6] Since the note was held not to have the effect of a dividend, the gain was viewed as realized from the exchange of property and taxed as long term capital gain. Judgment was rendered for the plaintiff for an overpayment of federal income tax for 1963 in the amount of $43,748.13 plus interest. The District Court did not mention 26 U.S.C. § 302, concerning redemptions, in relation to § 356(a)(2).

The history of taxation of "boot" distributions in relation to what has become known as the "automatic dividend" rule has been mixed with confusion, shifting positions by the Commissioner, and much unfavorable commentary. The discontentment is traceable to Commissioner of Internal Revenue v. Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L. Ed. 1611 (1945), which commentators generally agree was assumed to say that "§ 356(a)(2) automatically converted any recognized gain into dividend income, to the extent of the distributing corporation's earnings and profits, where the taxpayer continued as a shareholder after the exchange." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 14.34 (1971) (footnote omitted) (hereinafter Bittker & Eustice). The Bedford rule is generally known as the "automatic dividend" rule.

The Commissioner has vacillated in arguing for the adoption of the "automatic dividend" rule in different cases.[7]

Commentators have strongly criticized the "automatic dividend" rule supposedly announced by Bedford.[8] In the District Court, the Commissioner argued that the "automatic dividend" rule should be applied, but on appeal agrees that the "District Court in this case was correct in rejecting the 'automatic dividend' reading of the Bedford opinion."

The crucial issue then becomes whether this "boot" distribution has "the effect of a distribution of a dividend" under § 356(a)(2). The answer is not without difficulty since the distribution has some but not all the characteristics of either a sale or a dividend. The Commissioner admits this, but contends that the dividend characteristics predominate in this factual situation. We do not agree.

■ A dividend is generally defined as a "distribution of earnings and profits which effects no change in basic relationships between the shareholder and either the corporation or the other shareholders." Himmel v. C. I. R., 338 F.2d 815, 817 (2d Cir. 1964). Basically, a dividend is a "pro rata distribution out of corporate earnings and profits." Hawkinson v. Commissioner of Internal Revenue, 235 F.2d at 751. A redemption of corporate shares ordinarily would result in a sale, i.e. a retiring stockholder, but a pro rata redemption of corporate shares is viewed as a dividend. United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). Such redemptions need not be

6. The District Court rejected the "automatic dividend" rule for "boot" distributions (to be discussed later in the text) by relying on Hawkinson v. Commissioner of Internal Revenue, 235 F.2d 747 (2d Cir. 1956) and Idaho Power Co. v. United States, 161 F.Supp. 807, 142 Ct.Cl. 534, cert. denied, 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958).

7. Generally the Commissioner has urged the courts to apply the "automatic dividend" rule. However in Idaho Power Co. v. United States, supra, the Commissioner argued that courts in these cases "closely examined all of the surrounding circumstances and treated the fact of diminution

of earnings and profits as only one of the factors to be considered." Quoted in Shoulson, Boot Taxation: The Blunt Toe of the Automatic Rule, 20 Tax L.Rev. 573, 585 (1965). Idaho Power involved the issue of whether a corporation was entitled to a dividends paid credit, and it was to the Commissioner's advantage to argue against the application of the "automatic dividend" rule.

8. See, e. g., Shoulson, supra; Bittker & Eustice, supra at § 14.34; Wittenstein, Boot Distributions and Section 112(c)(2): A Re-examination, 8 Tax L.Rev. 63 (1952).

totally pro rata to be considered as essentially equivalent to a dividend. Sachs v. Commissioner of Internal Revenue, 277 F.2d 879, 882–883 (8th Cir.), cert. denied, 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960). The total factual situation determines whether a redemption of corporate shares, in whatever form taken, is essentially equivalent to a dividend. Thus an ultimate factual question is presented. Treas.Reg. § 1.-302–2(b).

■ The Commissioner argues that in defining the "effect of the distribution of a dividend" under § 356(a)(2), the redemption provisions of § 302 should be applied.[9] In making this contention, the Commissioner inferentially concludes that the definition of a dividend under § 316[10] does not in itself provide a complete description of a dividend for the purpose of § 356(a)(2). This position is consistent with contending that an "automatic dividend" rule does not apply to all "boot" distributions, for the definition in § 316(a), if applied by itself, has the same result as the *Bedford* "automatic dividend" rule. Although the Code does not expressly so provide, we agree with the Commissioner that § 356(a)(2) should be read *in pari materia* with § 302 for the purpose of determining whether a distribution had the effect of a dividend.[11]

9. 26 U.S.C. § 302 reads in part:
"Sec. 302. Distribution in Redemption of Stock.
"(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
"(b) Redemptions treated as exchanges.—
"(1) Redemptions Not Equivalent to Dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.
"(2) Substantially Disproportionate Redemption of Stock.—
"(A) In general.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.
"(B) Limitation.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.
"(C) Definitions.—For purposes of this paragraph, the distribution is substantially disproportionate if—
"(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time, is less than 80 percent of—
"(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

"For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value."

10. Section 316(a) reads:
"Sec. 316. Dividend Defined.
"(a) General rule.—For purposes of this subtitle the term 'dividend' means any distribution of property made by a corporation to its shareholders—
"(1) out of its earnings and profits accumulated after February 28, 1913, or
"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. "Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection."

11. Hawkinson v. Commissioner of Internal Revenue, 235 F.2d at 751; Ross v. United States, 173 F.Supp. 793, 797, 146 Ct.Cl.

Further the Commissioner contends that the "effect of the exchange was the same as though F & G issued its note for $102,002 to the taxpayer prior to the reorganization in redemption of a portion of his F & G stock." This redemption would reduce the taxpayer's percentage ownership in F & G from 99.16 per cent to 95.43 per cent, and the redemption would not fall within the so-called "safe harbors" of § 302(b)(2), *supra,* since, *inter alia,* the taxpayer-shareholder owned more than 50 per cent of the total combined voting power of F & G stock after the redemption. If this analysis of what stock was redeemed is accepted, the Commissioner correctly argues that the note should be taxed as a dividend under § 302 because the taxpayer owned almost 100 per cent of F & G stock. United States v. Davis, 397 U. S. at 313, 90 S.Ct. 1041.

■ In order to evaluate the Commissioner's casting of the consolidation of the corporations and distribution of the note as a redemption of F & G stock, it is necessary to examine § 302. Redemptions of stock are treated as distributions in part or full payment for exchange for stock under § 302(a), if the exchange meets the requirements of § 302(b). Section 302(b)(2) obviously does not apply here as the taxpayer would have greater than 50 per cent of the voting power of all classes of stock after redemption.[12] However, § 302(b)(1) provides that "Subsection (a) shall apply if the redemption is not es-

sentially equivalent to a dividend." Therefore, even if an exchange does not qualify as a "safe harbor" under § 302(b)(2), it is still possible for the exchange to be a redemption or sale for tax purposes if it is "not essentially equivalent to a dividend" under § 302(b)(1).[13]

■ In testing dividend equivalence under § 302(b)(1), Treas.Reg. § 1.302-2(b) (1955) states that "[t]he question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case." Courts agree that the determination is ultimately factual. United States v. Carey, 289 F.2d 531, 537 (8th Cir. 1961) (and therein cited cases); United States v. Fewell, 255 F.2d 496, 499 (5th Cir. 1958).

In deciding whether the exchange under the facts of this case was a redemption qualifying as an exchange under § 302, it is necessary to determine what stock was redeemed for the note and what factors are relevant to defining "essentially equivalent to a dividend" under § 302.

First, a threshold question is what stock did the taxpayer exchange for the $102,002 note. As indicated previously, the Commissioner argues in his brief on appeal that the taxpayer exchanged a portion of his F & G stock for the note prior to the consolidation of the corporation. During the oral argument, counsel

---

223, cert. denied, 361 U.S. 875, 80 S.Ct. 138, 4 L.Ed.2d 113 (1959); Bittker & Eustice, *supra* at § 14.34; Moore, Taxation of Distributions Made in Connection With a Corporate Reorganization, 17 Tax L.Rev. 129, 139, 150–51 (1961). Neither the Commissioner or taxpayer argues that the distribution of the note in this case was due to a partial liquidation under 26 U.S.C. § 346, and therefore this opinion expresses no view on whether these facts would warrant a finding that a partial liquidation had occurred.

12. Section 302(b)(2) establishes certain mathematical calculations to determine

whether an exchange of stock falls within the category termed as "substantially disproportionate redemption of stock." Commentators have called this provision the "safe harbor" situation, since a redemption satisfying the rigid mathematical test will automatically qualify for classification as an exchange subject to preferred tax treatment.

13. For a discussion of redemptions, see Moore, Dividend Equivalency—Taxation of Distributions in Redemption of Stock, 19 Tax L.Rev. 249 (1964).

for the Commissioner suggested as an alternative that a portion of the value of the note was exchanged for a portion of F & G stock and a portion of the value of the note was in exchange for a portion of World Wide stock. Therefore, the portion of the value of the note in exchange for World Wide stock would apparently qualify under the "safe harbor" of § 302(b)(2), whereas the portion of the note in exchange for F & G stock would not qualify under § 302(b)(2), or according to the Commissioner, under § 302(b)(1).

In analyzing this exchange, the Commissioner in his brief and during oral argument has mistakenly applied an artificial analysis in determining which corporation's stock was redeemed for the note. We agree with the Commissioner that "it is not material whether the distribution is actually made by the corporation entering the reorganization or by the corporation resulting from the reorganization." Courts and the Commissioner have said that it is irrelevant whether the earnings and profits were distributed before or after consolidation. *Ross v. United States,* 173 F.Supp. at 797. However, we are here confronted with the factual circumstance that there were two corporations, F & G and World Wide, before reorganization and one after reorganization, Omni. Theoretically and in addition to the Commissioner's oral suggestion, we could look to F & G alone, World Wide alone, or F & G and World Wide together (in effect Omni at the time of consolidation, April 1, 1963) as the distributing corporation.

We think that it is artificial for the Commissioner to contend that the note was issued by F & G alone or that the note was issued partially by F & G and partially by World Wide. The issuance of the note was part of an entire corporate reorganization based on the capital accounts of both F & G and World Wide. The corporations involved did not exist separately but were owned and controlled by the same shareholders but in different proportions. We think that the note was issued by Omni in exchange for a portion of Omni stock that the taxpayer would have received if he had taken Omni stock entirely instead of receiving Omni stock and a note issued to him by Omni. In percentages and according to the Commissioner's figures, the taxpayer reduced his ownership in Omni from 85 per cent to 61.7 per cent, or in other words the taxpayer exchanged 23.3 per cent of his Omni stock for the note that was issued to him by Omni.[14]

Another reason exists for holding that the note was issued by Omni. The entire concept of a redemption contemplates a change in ownership between an ongoing corporation and a newly formed corporation or within an ongoing corporation itself. For example, underlying the "safe harbor" provision, § 302(b)(2), is the rationale that a substantially disproportionate redemption of stock leads to the conclusion that the exchange is a redemption. The percentage requirements, e. g. the 50 per cent rule, refers to the necessity of having 50 per cent of the total voting stock *after redemption.* This rule and other redemption provisions make sense only in *relation to a corporation that will continue to exist.* If a substantially disproportionate redemption of stock has occurred the distribution clearly can be said to be a sale rather than a dividend because the stockholder has relinquished valuable rights in the future business. Further, the rights of stock ownership— to vote, to participate in earnings, and to share in net assets on liquidation—are all affected by a redemption. But these rights and the effect of a redemption only make sense in relation to a corporation that will be engaged in doing busi-

14. The Commissioner has not urged us to apply the constructive ownership provision of § 318. United States v. Davis, *supra,* held that § 318 does apply to § 302(b)(1). Since the Commissioner has made no argument concerning the application of § 318 to the facts of this case, we accept the above figures used at trial by the Commissioner.

ness after the redemption. To analyze the present case as a redemption of F & G stock alone, World Wide stock alone, or a portion of F & G and a portion of World Wide is an artificial reading of the redemption provisions, for F & G and World Wide were dissolved as part of the Plan. The change in ownership that would be significant due to a redemption would be a change in ownership in Omni, the corporation that would exist after the redemption and would have voting stock, earnings, and assets that would be affected. Therefore, due to the underlying rationale of § 302 and redemptions in general, we determine under the facts of this case that the taxpayer has in effect exchanged Omni stock for the $102,002 note.

■ Viewing the distribution of the note as an exchange for Omni stock, the taxpayer's redemption does not fall within the "safe harbor" of § 302 (b)(2), since he owned approximately 61.7 per cent of the stock of Omni after the redemption.[15] However, the exchange may still qualify as a redemption under § 302(b)(1) if it is "not essentially equivalent to a dividend."[16]

United States v. Carey, *supra,* typically represents the method of analysis that courts used in determining the factual question of dividend equivalence under § 302 before United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). The Eighth Circuit said in that case:

"Among these criteria are: The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital." United States v. Carey, *supra,* 289 F.2d at 537, quoting Heman v. Commissioner of Internal Revenue, 32 T.C. 479 (1959), *aff'd,* 283 F.2d 227 (8th Cir. 1960) (citations omitted).

*See also* Annot., 170 A.L.R. 1392 (1947) for a discussion of relevant factors for analyzing redemptions as of 1947.

■ This Court has since recognized, however, that *Davis* has changed the law in this area and that a business purpose is no longer a relevant inquiry. Johnson v. United States, 434 F.2d 340, 343 (8th Cir. 1970); *accord,* Title Insurance and Trust Co. v. United States, 326 F.Supp. 617, 620 (C.D.Calif.1971). In fact, the language in *Davis* broadly states that the "explanation [contained in the legislative history of § 302(b)(1)] gives no indication that the purpose behind the redemption should affect the result." United States v. Davis, *supra,* 397 U.S. at 310–311, 90 S.Ct. at 1047 (footnote omitted). Rather the Court specifically said that to qualify under § 302(b)(1) "a redemption must result in a *meaningful reduction* of the shareholder's proportionate interest in the corporation."

15. The record and the briefs do not indicate whether Omni's Class B stock was voting or non-voting stock. The taxpayer held 61.7 per cent of Classes A and B stock and 61.9 per cent of Class A stock alone. The use of either percentage would disqualify the exchange under § 302(b)(2) (B).

16. It might be noted here that the analysis used to determine that the taxpayer exchanged 23.3 per cent of Omni stock for the note negates a pro rata distribution. However, even if there has been no formal declaration of a dividend or there has been no general distribution to all shareholders, this is no reason to ignore the true nature of any distribution of payment of corporate funds in considering dividend equivalency. Sachs v. Commissioner of Internal Revenue, 277 F.2d 879, 882–883 (8th Cir.), cert. denied, 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960).

United States v. Davis, *supra* at 313, 90 S.Ct. at 1048 (emphasis added). We read that language and *Davis* as holding that the proper inquiry is the percentage change of ownership in the corporation and the attendant overall results due to that change. Stated otherwise, the basic inquiry is whether the distribution had the "net effect" of a dividend. Brown v. United States, 345 F. Supp. 241, 244 (S.D.Ohio 1972) (and cases cited therein).

■ We think that if a distribution is not to have the "net effect" of a dividend, there must have occurred a meaningful reduction of the redeeming shareholder's proportionate interest or in other words a meaningful change in the relative economic interests or rights of the shareholder after the redemption. United States v. Davis, *supra*, 397 U.S. at 313, 90 S.Ct. 1041; Brown v. United States, *supra*, 345 F.Supp. at 244. We further think that it is improper to refer to the "net effect" standard as the "net economic test," as in Brown v. United States,[17] since a meaningful change in shareholders' voting power[18] is a relevant inquiry. Also "net effect" can no longer be said to include the business purpose or motive of a corporation in making the distribution as was the case in United States v. Fewell, *supra*, 255 F.2d at 499–500.

The Commissioner argues that Hawkinson v. Commissioner of Internal Revenue, *supra,* provides a close parallel to this case and supports his analysis that the distribution of the note had the effect of a dividend. In *Hawkinson*, the taxpayer and other members of the Whitney family owned shares in Whitney Chain Manufacturing Company (Whitney Chain) that was consolidated with Hanson-Whitney Machine Company to form Whitney-Hanson Industries. After the redemption, the Whitneys received 5.7 per cent less stock in Whitney Chain because Whitney Chain canceled an indebtedness owed to it by some of the Whitneys. The court held that this cancellation of indebtedness as part of a plan of consolidation had the effect of a dividend since the whole transaction was "in reality a preservation of the economic status quo by a realistic alignment of ownership in the new corporation to reflect its productive assets." Hawkinson v. Commissioner of Internal Revenue, 235 F.2d at 751.

Arthur H. Squier, 35 T.C. 950 (1961), is more closely analogous to this case and distinguishable from *Hawkinson*. In *Arthur H. Squier,* the taxpayer owned, directly and constructively, 63.3 per cent of stock before the redemption and 56.82 per cent after the redemption. Also after the redemption, the taxpayer, an estate, had less than 50 per cent direct ownership, and a dissident minority interest increased from 36.7 per cent to 43.18 per cent. The Tax Court focused on a significant change in control and held that this 6.48 per cent reduction in shareholder interest due to the redemption caused the exchange to not have the effect of a dividend.

Apparently no change in voting power was present in *Hawkinson* after the redemption. However, in this case, the taxpayer reduced his interest in Omni from 85 per cent to 61.7 per cent after the redemption. Under Arkansas law, two-thirds vote is required for amending the articles of incorporation (Ark.Stat. Ann. § 64–507), for merger or consolidation (Ark.Stat.Ann. § 64–703), and for liquidation (Ark.Stat.Ann. § 64–901).

The redemption here has created a meaningful change in the voting power of the taxpayer under Arkansas law. Also, viewing the transaction as a realistic whole, the taxpayer has reduced his holding in one corporation, F & G, from almost complete ownership in F & G to 61.7 per cent ownership in Omni. In contrast, his ownership in World Wide was 56 per cent in relation to his 61.7

---

17. 345 F.Supp. at 244 (S.D. Ohio 1972).

18. Arthur H. Squier, 35 T.C. 950 (1961). Of course "voting power" may indeed eventually have an economic effect.

per cent ownership in Omni, which either before or after the redemption would make no difference under the above two-thirds requirements of Arkansas law. The change in voting power here is similar to the voting control focused upon in *Arthur H. Squier.*

 Further, although there is no *per se* rule on what percentage reduction of ownership is required to assure that a redemption does not have the effect of a dividend,[19] the taxpayer in this case has a 23.3 per cent less of a right to dividends and to assets upon liquidation, which in itself is of considerable significance.

 We think it appropriate to note at this point that Judge Bright in his dissent focuses on the applicability of the constructive ownership provisions to this case. We feel in connection therewith that an issue not raised at trial or on appeal does not provide a proper predicate for a decision.

The dissent basically reasons that the constructive ownership provisions do apply, which would make the taxpayer's ownership interest 72 per cent after the redemption, instead of 61.7 per cent. The dissent, further, is inclined to agree that *Arthur H. Squier* might be applicable to this case "[i]f the record in the present case revealed the exceptional situation where the interest of family-member shareholders . . . were *in fact* adverse to the taxpayer. . . ."

However, the Commissioner at trial, in his brief, and during oral argument employed the 62 per cent figure as the proper percentage ownership of the taxpayer after redemption. He has never mentioned the possible applicability of § 318, and therefore the record and briefs have not discussed this issue.

 This Court has recently held that the Commissioner's failure to raise, before or at trial, the theories, Code sections, and regulations upon which he relies, deprives the taxpayer of fair notice and opportunity to defend against presumptively correct deficiency assessments. Commissioner of Internal Revenue v. Transport Manufacturing and Equipment Co., 478 F.2d 731, 736 (8th Cir. 1973). Although the facts as to ownership by family members were stipulated, the failure of the Commissioner to raise the issue *at all* makes an opportunity by the taxpayer to respond impossible. If the issue had been raised at the appropriate time, it could have been articulated and explicitly briefed. We offer no view on whether § 318 would apply under the facts of this case and only conclude that the failure of the Commissioner to raise this issue at all precludes its consideration by this Court.

 The factual circumstances in this case lead us to the conclusion that the "boot" distribution of the promissory note of $102,002 was "not essentially equivalent to a dividend" under § 302(b)(1) nor had "the effect of a distribution of a dividend" under § 356(a)(2).

The judgment of the District Court is affirmed.

BRIGHT, Circuit Judge (dissenting).

I respectfully dissent. My difference with the majority lies not in its statement of the applicable law but in its application of that law to the total factual situation. This record discloses that the taxpayer, William F. Wright, owned all of F & G Construction Company (99.2 percent), except for one share held by his wife and one share held by his attorney, and that immediately prior to consolidation, this corporation's earned surplus amounted to $101,802. The amount of the earned surplus was only $200 less than the amount of the note that the taxpayer received upon consolidation. As noted by the majority, the taxpayer owned 56 percent of the shares of a sec-

---

19. For one comparison, note that *Hawkinson* involved a 5.7 per cent reduction of stock ownership due to the redemption and *Arthur H. Squier* involved a 6.48 per cent reduction.

ond corporation, World Wide, which was consolidated into Omni. Dunn, taxpayer's business associate, owned 30 percent, and taxpayer's mother and his attorney owned the remaining shares, constituting approximately 14 percent of the total shares.

The taxpayer has stipulated that in consolidating F & G and World Wide into Omni, he, as well as Dunn, desired to attain equity ownership in Omni of the same proportionate percentage as their ownership in Danco Construction Company, a third corporation owned 71.-5 percent by taxpayer, 27.9 percent by Dunn, and .6 percent by taxpayer's attorney.

Interestingly enough, following the consolidation of World Wide and F & G into Omni and after the payment of "boot" to taxpayer and the contribution of new capital by Dunn, the shareholdings show Dunn possessed of the almost identical percentage interest in Omni (27.8 percent) as his percentage of stock in Danco (27.9 percent). Taxpayer, however, was left with only 61.7 percent of Omni. Thus, in order for taxpayer to attain the same approximate percentage equity ownership in Omni as he had in Danco, the stipulation[1] of the parties would require counting shares owned by Mrs. W. F. Wright, Sr. (taxpayer's mother), Mrs. W. F. Wright, Jr. (taxpayer's wife), and John Thurman, Sr. (taxpayer's lawyer) as equitably owned and controlled by taxpayer.

Moreover, as the majority aptly observes in n. 14 of the opinion, the constructive ownership rules of 26 U.S.C. § 318 apply to § 302(b)(1). Thus, under the attribution rules the stock of the taxpayer's wife and mother must be deemed owned by the taxpayer in determining whether the stock redemption was essentially equivalent to a dividend. United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1969).

The majority enunciates the following test for determining whether a stock redemption was "not essentially equivalent to a dividend:"

> We think that if a distribution is not to have the "net effect" of a dividend, there must have occurred a meaningful reduction of the redeeming shareholder's proportionate interest or in other words a meaningful change in the relative economic interests or rights of the shareholder after the redemption. [Majority opinion at 609 (citations omitted).]

In finding such a "meaningful change," the majority emphasizes the reduction of the taxpayer's voting power in Omni whereby he no longer directly retained the two-thirds interest necessary to amend the articles of incorporation or to force a merger, consolidation, or liquidation of Omni under Arkansas law.

I find this analysis flawed because the taxpayer by stipulation asserted that his intended "equity ownership" in Omni was to be the same as that in Danco, *i. e.*, approximately 72 percent. Practical considerations, as well as the rules of attribution, indicate that the taxpayer has retained an interest in Omni which closely approximates the *intended* percentage of equity ownership. Of course this percentage is well over the two-thirds figure necessary for the taxpayer to exercise every power he possessed in the merging corporation, F & G.[2]

1. The stipulation stated:
 [T]hey [taxpayer and Dunn] wished to pool the assets of World Wide Motors, Inc. and F & G Construction Company into a single corporate operation with the equity ownership of said new corporation as between Wright and Dunn to be approximately the same as that of Danco Construction Company.

2. Tangentially, I also note my disagreement with the views of the majority that the taxpayer reduced his ownership in Omni by 23.3 percent. This computation fails to take into consideration ownership by attribution and the new capital contributed by Dunn. Thus, I compute taxpayer's diminution in ownership at approximately 10 percent (82 percent before redemption; 72 percent after redemption), a relatively insignificant change.

The majority's reliance upon Estate of Arthur H. Squier, 35 T.C. 950 (1961), is misplaced since that case is clearly distinguishable on its facts. Initially, I note that if one uses the same method to compute the taxpayer's interest in *Squier* as that used by the majority here, *i. e.*, without applying the attribution rules of § 318, the taxpayer's percentage interest in *Squier* was 50.09 percent before the redemption and 41.27 percent after the redemption. As a result of the redemption, the principal, nonrelated, minority shareholder actually became the majority shareholder with 43.-18 percent of the shares.

However, even if the rules of attribution are applied to the factual situation in *Squier* to reach the ownership percentages cited by the majority,[3] the present factual situation is not analogous. Contrary to the majority's assertion that the "dissident minority" interest was the 43.18 percent shareholder, the "dissident" shareholders in *Squier* were actually family members whose stock the Tax Court attributed to the taxpayer[4] under the rules of 318, *i. e.*, taxpayer's wife and grandchild.[5] These family members had had a severe disagreement with the taxpayer (the executor of the estate) over the selection of a new president upon the death of Mr. Squier.[6] The Tax Court found that as a result of the executor's failure to appoint decedent's son-in-law as the new president, there was "considerable friction and strained relations" between the taxpayer-executor and the decedent's family. Thus the Tax Court concluded:

> [T]he record herein reveals a sharp cleavage between the executor and members of the Squier family, and *in spite of the attribution rules as to stock "ownership," the redemptions herein in fact resulted in a crucial reduction of the estate's control over the corporation.* [Emphasis on "control" in original.] Accordingly, notwithstanding the attribution rules, the redemptions in this case did result in a substantial dislocation of relative stockholdings in the corporation and also *in fact* brought about a significant change in control. [*Id.* at 956 (emphasis added).]

If the record in the present case revealed the exceptional situation where the interest of family-member shareholders (whose shares were attributable to the taxpayer) were *in fact* adverse to the taxpayer, I would be inclined to agree that the *Squier* case would be applicable here, and under its holding the taxpayer would have made a meaningful change in his interest through the redemption. However, the record before us provides no basis for assuming that shares attributable to the taxpayer are held by shareholders with interests adverse to the taxpayer.

Therefore, I conclude that the majority has ignored the taxpayer's own argument that "the type of treatment to be accorded distributions in connection with reorganizations is to be determined from all the facts pertaining to a given case." Appellee's Br. at 3. Instead, the majority has focused only on an artificial change in the taxpayer's interest, which, when closely scrutinized, reveals that the taxpayer has recovered all of the earned surplus of F & G corporation without surrendering any meaningful control in the new corporate entity (Omni). Whether or not we apply the

---

3. The percentages provided by the majority in regard to the taxpayer's interest (63.03 percent before the redemption and 56.82 percent after the redemption) were not discussed by the Tax Court because its holding was not based on the change in percentage ownership but on the actual change in control.

4. I do not here consider whether the Tax Court was correct in applying attribution rules of § 318.

5. The grandchild's shares were held in trust by the decedent's daughter.

6. Instead of being a "dissident" interest, the nonfamily shareholder actually cooperated with the executor on most corporate decisions. Estate of Arthur H. Squier, 35 T.C. 950, 951 (1961).

attribution rules of § 318, practical considerations, *i. e.,* family ownership of stock and the stipulation indicating taxpayer's intended ownership, amply demonstrate that there has been no significant change in taxpayer's ownership interest in Omni by reason of the distribution of boot. Thus the "boot" received by the taxpayer must be treated as a dividend for tax purposes. 26 U.S.C. § 356(a)(2).